NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

UNITED FURNITURE WORKERS OF AMERICA, AFL–CIO, Respondent.

No. 84, Docket 28967.

United States Court of Appeals Second Circuit.

Argued Oct. 2, 1964.

Decided Oct. 28, 1964.

Stephen B. Goldberg, N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Atty. Gen., George H. Cohen, Washington, D. C., on the brief), for petitioner.

Martin Raphael, General Counsel, United Furniture Workers of America, AFL-CIO, for respondent.

Before FRIENDLY, KAUFMAN and MARSHALL, Circuit Judges.

KAUFMAN, Circuit Judge:

The National Labor Relations Board petitions for enforcement of an order adopting a trial examiner's findings and conclusions that the United Furniture Workers of America, AFL-CIO, violated Section 8(b) (7) (B) of the National Labor Relations Act, 29 U.S.C. § 158 (b) (7) (B), added by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, which prohibits "recognitional" or "organizational" picketing within twelve months after a valid election. Because it is difficult to determine, on the record before us, on exactly what basis the Board found that the Union had engaged in "picketing" within the meaning of § 8(b) (7) (B), and whether it applied the proper criteria, we withhold enforcement and remand the case for additional findings and conclusions consistent with this opinion, to be made after a further hearing with respect to that issue if the Board considers this necessary or advisable.

In order to view this case in proper perspective we begin our account of the facts with August 9, 1961, when the Board certified the United Furniture Workers of America, AFL-CIO, as the bargaining representative of the production and maintenance employees at the Jamestown Sterling Corporation's furniture manufacturing and distributing plant in Ellicott, New York. After a short period of unsuccessful contract negotiations, the Union struck on October 3, 1961, and commenced picketing Jamestown's plant with signs reading, "On Strike." Initially, the picketing followed the traditional form of ambulatory patrolling by union members carrying placards in front of the plant. But in the spring of 1962 the patrolling ceased and, instead, "On Strike" signs were affixed to poles and trees in front of Jamestown's plant. Then, in August 1962, the Union began to secure the signs around the poles with a chain to which a lock was attached. Five days a week at 6 a. m. the signs were put in place by striking employees who represented the Union. After affixing the signs, the Union representatives stationed themselves in automobiles in a parking lot across the street from the plant, where they remained until about 3 p. m., at which time they removed the signs and departed only to return the next working day and go through the same procedure.

Jamestown responded to the strike in January 1962, by hiring replacements. And, on December 10, 1962, the Company filed a petition with the Board's Regional Director requesting an election to determine whether the Union represented a majority of its employees. After conducting a hearing on the petition, the Regional Director found, contrary to the Union's contentions, that a question concerning representation existed and that an election should be held. The Regional Director, however, postponed ruling on the eligibility of the strikers and their replacements to participate in the election until after ballots had been cast and challenged. On March 1, 1963, the Board declined to review his action.

The election was conducted on March 5, 1963, at which time 118 of the approximately 198 voters were challenged. Since the challenges were determinative of the election results, the Regional Director impounded the ballots and investigated the challenges administratively, giving both the Company and the Union full opportunity to submit evidence in support

of their respective contentions. The challenged eligibility of both the strikers and their replacements to cast ballots turned on whether the replacements were intended to be permanent or temporary. The Union members, as economic rather than unfair labor practice strikers, would be entitled to vote only if permanent replacements had not been hired in their stead. National Labor Relations Act, § 9(c) (3); N. L. R. B. v. MacKay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938). And the replacements would be eligible to vote only if they had been permanently hired. Pacific Tile & Porcelain Co., 137 N.L.R.B. 1358, 1363-65 (1962). The Regional Director found that the replacements were permanent and therefore overruled the challenges to their ballots and sustained the challenges to the strikers' ballots. He also denied the Union's request for a hearing to resolve the issue of voter eligibility because, under the Board's Rules and Regulations, 29 C.F.R. 102.69, the Union had raised no "substantial and material factual issues" warranting a hearing. The Board declined to review this decision.

On May 24, 1963, the Regional Director opened the ballots of the challenged replacements and certified that of approximately 128 eligible voters, 25 had voted for and 90 against the Union. The Union promptly filed objections, asserting that it had been improper to order an election in the first instance because there was no evidence that the strikers were permanently replaced and claiming further that it had been denied due process by the Regional Director's decision to investigate the challenges administratively rather than by holding a full-scale hearing. But the Regional Director, on June 6, 1963, overruled these objections and certified that the Union was not "the exclusive representative of all the employees, in the unit herein involved, within the meaning of Section 9(a) of the National Labor Relations Act." Once again, the Board declined to review his decision.

Despite these adverse decisions, the Union representatives continued to affix signs to poles outside Jamestown's plant and to have these observed by its representatives in the parking lot. The only change in the Union's activities was that after the Regional Director's tally of ballots of May 24, 1963, established that the Union lost the election, the legend on the signs was amended from "On Strike" to read "Wages at Jamestown Sterling Are Not Up To Area Standards." But, on May 29, 1963, the Union's Label Director, Sol Silverman, visited a Jamestown customer and advised him that the Union planned to continue to picket the Company's customers; when Silverman was reminded that the Furniture Workers had lost the election, he said that "in his opinion, * * * the election did not mean anything * * * and he thought this whole matter with Jamestown Sterling could still be settled." Moreover, on June 5 the Union, through Silverman, wrote Jamestown's customers stating that the Union was willing to negotiate a settlement of the strike. And at a news conference that evening Silverman stated that the Union had not yet lost its right to be bargaining agent at the plant and would continue to be active there for a long time to come. Finally, the trial examiner noted that at no time did the Union disclaim either its status as statutory representative of the Company's production and maintenance employees or its desire to bargain for them.

With this factual background before it, the Board, on July 29, 1963, issued a complaint alleging that the Union violated Section 8(b) (7) (B) of the National Labor Relations Act by picketing Jamestown Sterling Corporation since June 6, 1963, with an organizational or representational objective within one year after the employees rejected the Union in a valid election. These charges were referred to a trial examiner. The Board, upon the trial examiner's record and findings, ordered the Union to cease and desist from picketing, causing to be picketed, or threatening to picket Jamestown Sterling in violation of Section 8(b)

(7) (B), and to cease and desist from the current unlawful picketing for a period of one year. 146 N.L.R.B. No. 74.

In this enforcement proceeding the Union reiterates, in essence, the same defenses that were unsuccessfully urged upon the trial examiner and the Board. First, the Union argues that by affixing signs to trees and poles and then retiring to their cars its representatives were not "picketing" within the meaning of Section 8(b) (7) (B). Second, it contends that its objective was not recognitional or organizational but simply to publicize the fact that Jamestown's wages were below area standards. Finally, the Union claims that the election was invalid because it should not have been directed in the first instance and, in addition, that the Union was deprived of its rights by the Regional Director's administrative investigation of the striker-replacement issue when he should have held a trial-type hearing, a deprivation allegedly aggravated by reliance on what the Union considers to be an improper presumption that replacements for economic strikers are permanent employees.

Because the Board's findings of fact on the picketing issue seem incomplete to us, we cannot be sure that the Board used the proper criteria in determining that the Union's conduct was "picketing"; therefore, we remand for additional findings and conclusions to be made after a further hearing with respect to the "picketing" issue if the Board considers this necessary or advisable. Since disposition of that issue may moot the Union's other contentions, it is enough to say at the moment that we are not sufficiently persuaded by them to direct the Board to take any further proceedings on their account.

Our reasons for withholding enforcement and directing the remand follow. The term "to picket" made its first appearance in the national labor acts in the 1959 amendments. Although Section 8(b) (7) (B) can be invoked only when "picketing" is present, the legislative history indicates no awareness that the new section presents a threshold definitional problem; the solution must come from the Board and the courts. We derive some guidance from this Court's opinion in N. L. R. B. v. Local 182, Teamsters, 2 Cir., 314 F.2d 53 (1963). There, Union representatives planted signs in a snowbank abutting the entrance to the employer's premises and then retired to cars parked on the shoulder of the adjacent highway. The sign-watchers answered inquiries about the meaning of the signs and also left their cars to speak to the drivers of delivery trucks, thus interrupting deliveries. Judge Friendly's opinion pointed to dictionary definitions indicating that a picket may simply stand rather than walk. He wrote that the activity "was none the less picketing because the Union chose to bisect it" by placing the signs in the open and the patrollers in a nearby car. 314 F.2d at 58. But Local 182 does not resolve the problem in this case, for here it does not appear that the Union's representatives ever left their automobiles.

The Local 182 decision, however, also rested on the Court's conclusion that "the Board did not act unreasonably in construing 'picket', a statutory term relating to a subject within its area of special competence, to include what the Union did [t]here." 314 F.2d at 58. But, application of the term to activity even further from traditional picketing requires more explanantion than was here afforded. The Board simply adopted the findings and conclusions of the Trial Examiner, who contented himself with referring to the Local 182 opinion as holding "that movement is not a requisite of picketing," thought it "a reasonable inference that the union representative in affixing the signs with chains and locks and sitting in cars were doing this so that the signs could be watched and protected," and ended with the rather meaningless conclusion that "By their conduct the strikers were establishing a locus in quo which was more than speech within the meaning of the cases." So far as we can tell from this, the Examiner and the Board would have held the activity here to be picketing even if no one

approaching the plant ever saw the union representatives or had any idea what they were about; if the conclusion rested on a view of that sort we would be unable to uphold it, even with all due regard to the Board's expertise.

The difficulty is that the sketchy findings we have outlined give no sufficient clue whether the Board considered those factors which have traditionally been invoked in distinguishing between prohibited picketing and protected free speech. Mr. Justice Douglas suggested the basis of this distinction when he wrote that "[p]icketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated." Bakery and Pastry Drivers and Helpers, Local 802, Teamsters v. Wohl, 315 U.S. 769, 776–777, 62 S.Ct. 816, 819–820, 86 L.Ed. 1178 (1942) (concurring opinion). It is urged upon us that one of the necessary conditions of "picketing" is a confrontation in some form between union members and the employees, customers, or suppliers who are trying to enter the employer's premises. "This confrontation invokes convictions or emotions sympathetic with the union activity, fear of retaliation if the picket is defied, the loyalty of nonpickets who are union members, simple embarrassment, or other similar reactions. Underlying all of these responses is an element of intimidation resulting from the physical presence of the pickets or the heritage of the union picket line tainted with bloodshed and violence." Note, Picketing by an Uncertified Union: The New Section 8(b) (7) (B), 69 Yale L.J. 1393, 1397 (1960).

We cannot be sure that the Board considered the extent of confrontation necessary to constitute · picketing in reaching its conclusion. There is no indication whatever whether the men in parked cars were located in close proximity to Jamestown's premises so that they could be or were seen by employees, customers, or suppliers entering the plant. Nor does the record disclose whether the men in the cars were reasonably identifiable as union representatives. These factors would seem to be important in determining whether "confrontation" was present. Although we do not consider it necessary or appropriate at this time to attempt to define the precise boundary of what the Board may consider to be "picketing," the test here would seem to be whether the presence of the representatives in the car was intended to and did have substantially the same significance for persons entering the employer's premises as if they had remained with the signs, or was only a necessary precaution to safeguard the signs. Certainly if the representatives had stayed in a house unseen by anyone the Board could not reasonably characterize the activity as picketing.

We therefore withhold enforcement and remand for additional findings and conclusions. They may be made after a further hearing with respect to whether the Union's conduct constituted "picketing" within the meaning of Section 8(b) (7) (B), if the Board considers this necessary or advisable, all in conformity with this opinion.