309 F.3d 1
 INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES, LOCAL UNIONS NO. 970 AND 1144, AFL-CIO-CLC, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 01-1242.
 No. 01-1323.
 United States Court of Appeals, District of Columbia Circuit.
 Argued September 6, 2002.
 Decided October 25, 2002.
 
 On Petition for Review and Application for Enforcement of an Order of the National Labor Relations Board
 Forrest H. Roles argued the cause and filed the briefs for W.R. Mollohan, Inc.
 Joseph E. Kolick, Jr. argued the cause for International Union of Painters and Allied Trades, Local Unions No. 970 and 1144, AFL-CIO-CLC. With him on the brief was Kirsten Lea Doolittle.
 David A. Fleischer, Senior Attorney, National Labor Relations Board, argued the cause for the Board. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Jr., Supervisory Attorney. Frederick Havard, Supervisory Attorney, and Jill A. Griffin, Attorney, National Labor Relations Board, entered appearances.
 Before: TATEL and GARLAND, Circuit Judges, and WILLIAMS, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
 STEPHEN F. WILLIAMS, Senior Circuit Judge:
 
 
 1
 This case arises from the refusal of an employer to enter into and abide by a collective bargaining agreement ("CBA") negotiated with various unions (collectively, the "union"). The employer claimed that it had not authorized the negotiators and therefore was not bound by the agreement; it also argued that the union's failure to have obtained majority status excused the employer's non-compliance. The National Labor Relations Board rejected these arguments. See W.R. Mollohan, Inc., 333 NLRB No. 162, 2001 WL 497324, at *1, *3 (2001). The employer also claimed that two clauses of the agreement violated the National Labor Relations Act. The Board rejected one such claim and accepted the other, relating to the "successorship clause." Id. at *2. But it ruled that the allegedly defective language in that clause was severable and therefore did not justify the employer's refusal to abide by the agreement. Id. at *3. The union petitioned for review, challenging the Board's edit of the successorship clause, and the Board filed an application for enforcement. The employer then filed an answer under Rule 15(b)(2) of the Federal Rules of Appellate Procedure, defending its refusal to bargain. Rejecting the employer's claims and accepting those of the union, we grant the Board's application for enforcement except with regard to the order's deletion of language from the successorship clause.
 
 
 2
 Because there is little overlap between the issues relating to the negotiations and majority status on the one hand, and to the two disputed clauses on the other, we address them separately.
 
 
 3
 Our review is governed by § 10(e) of the Act, 29 U.S.C. § 160(e), and the Administrative Procedure Act. The Board's factual findings "shall be conclusive" if supported by substantial evidence. 29 U.S.C. § 160(e). Its reasonable interpretations of the Act are entitled to deference under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984). Board interpretations of the CBA, however, receive no deference. Litton Fin'l Printing Div. v. NLRB, 501 U.S. 190, 202-03, 111 S.Ct. 2215, 2223-24, 115 L.Ed.2d 177 (1991).
 
 
 4
 * * *
 
 
 5
 W.R. Mollohan, Inc. is in the business of painting and repainting bridges, overpasses, and tunnels on federal and state highways. For many years, Mollohan signed union contracts negotiated by the Charleston Chapter of the Painting and Decorating Contractors of America ("the Association"), which represented several area employers in collective bargaining negotiations with the union. Mollohan's Vice President of Operations, Joe Beam, was president of the Association and served on its negotiating committee. The Association negotiated the contract preceding the one now in dispute, which Beam then signed on behalf of the company.
 
 
 6
 In March 1998 the union expressed its desire to negotiate a new contract by sending a letter to the Association. Beam, in his capacity as president of the Association, sent a similar letter to the union expressing the Association's desire to negotiate as well. At the first bargaining session, Beam and Association Secretary-Treasurer Ken Bowen told the union that they were representing seven named employers, including Mollohan. Negotiations began.
 
 
 7
 Beam resigned from the negotiating committee in the course of the negotiations, but didn't indicate that Mollohan was withdrawing authority from the Association to bargain on its behalf. About 10 days later, on April 28, 1998, the union and the Association reached agreement on a new CBA, subject to ratification by the union's membership, which followed in due course.
 
 
 8
 On May 8 Mollohan notified the Association and the union that it was withdrawing authorization from the Association to bargain on its behalf. The union took the position that the company was already bound, and asked Mollohan to sign. Mollohan refused and, without bargaining with the union, ceased making contractually required payments to several funds, and instead began depositing employee pension funds into an escrow account.
 
 
 9
 Acting on separate charges filed by the union, the Board's General Counsel issued a consolidated complaint alleging that Mollohan had violated §§ 8(a)(1), (5) of the Act, 29 U.S.C. § 158(a)(1), (5), by these and related acts of non-compliance with the agreement. Besides its claim that the negotiators lacked authority, Mollohan argued that the agreement was invalid because two of its clauses violated the Act, thus excusing Mollohan's non-compliance.
 
 
 10
 After a hearing, the Administrative Law Judge issued a decision entirely rejecting Mollohan's claims. It didn't have to consider severability, as it found the two challenged clauses not violative of the Act.
 
 
 11
 The Board affirmed the ALJ's findings of violations, holding that the Association had apparent authority to bind the company. Mollohan, 333 NLRB No. 162, 2001 WL 497324, at *1. Contrary to the ALJ, however, the Board found that some language in the successorship clause violated § 8(e) of the Act, and accordingly it modified the ALJ's recommended order to require that Mollohan execute and abide by the contract only after deletion of the unlawful language. Id. at *2-*3.
 
 
 12
 First, we reject Mollohan's argument that the Board's finding of apparent authority was not supported by substantial evidence. As both the ALJ and the Board discussed at length in their opinions, the Association told the union, in the presence of company representatives, that it represented the company, and the company did not purport to revoke that authority until after the agreement was reached. Id. at *1. Thus the Board's conclusion that the Association had apparent authority to bind Mollohan is supported by substantial evidence.
 
 
 13
 Although the company argues that the Board erred in deciding the case on an issue, apparent authority, that it says was not litigated before the ALJ, Employer's Br. at 13, Mollohan failed to raise the argument before the Board. Thus we lack jurisdiction. 29 U.S.C. § 160(e) ("No objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances."). Mollohan's attempted parry — that it could not raise the claim because it didn't know that the Board would adopt that theory until it issued its decision — doesn't work. Mollohan could have raised the point in a petition for reconsideration. International Ladies' Garment Workers' Union v. Quality Mfg. Co., 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975).
 
 
 14
 Second, although Mollohan appears to accept the general validity of the Board's rule that the company could not repudiate the agreement simply because the union had not attained majority status, John Deklewa & Sons v. Intern. Association of Bridge Workers, Local 3, 282 NLRB 1375, 1385, 1987 WL 90249 (1987) ("Deklewa"), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770, 775-780 (3d Cir.1988), it argues that the Board erred in not creating an exception to that rule.
 
 
 15
 Section 8(f) of the Act permits a construction industry employer and a union to enter into a contract even though "the majority status of such [union] has not been established ... prior to the making of such agreement." 29 U.S.C. § 158(f). The parties here pursued that course. The Board applied the interpretation of § 8(f) that it adopted in Deklewa, under which an employer may not unilaterally repudiate a pre-hire agreement unless the employees have voted to decertify the union or change their bargaining representative. See Mollohan, 333 NLRB No. 162, 2001 WL 497324, at *3.
 
 
 16
 In Deklewa the Board changed course from an earlier interpretation that had allowed repudiation of § 8(f) agreements at any time before the union gained majority status. The Deklewa Board found that the prior interpretation was not supported by the text or legislative history of the Act, and had caused disruption and instability because "neither the parties to the agreement nor the employees working under it can know with any degree of certainty what their respective rights and obligations are at any given time." Deklewa, 282 NLRB at 1383. In fact, the Board found that the right to repudiate a § 8(f) agreement was "so antithetical to traditional principles of collective-bargaining under the Act" that it was "likely that Congress would have expressly stated such a right if it intended to create one." Id. at 1381. So it held that both parties to a § 8(f) agreement are required by §§ 8(a)(5) and 8(b)(3) "to comply with that agreement unless the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative." Id. at 1385. The Third Circuit enforced the Deklewa ruling, finding it to be a reasonable and permissible construction of the Act. 843 F.2d at 775-80.
 
 
 17
 Mollohan does not here argue that the Board's Deklewa rule is an unreasonable interpretation of the Act. In fact, the company expressly "acknowledges the soundness of the Board's ... argument that the Board has authority to adopt reasonable interpretations of the Act, to which this Court must give deference, even when the Board has changed its mind in an effort to better effectuate those policies." Emp. Reply Br. at 4. Instead, Mollohan suggests that we should not approve the Board's reliance on Deklewa, in certain circumstances, i.e., "in a case like this one where its application is critical." Emp. Br. at 19.
 
 
 18
 In light of the company's limited argument, we have no need to rule upon the reasonableness of the Deklewa interpretation as a whole. The narrower claim for an exception builds on the proposition that application of a generally valid rule may prove invalid in a case presenting special circumstances. See, e.g., WAIT Radio v. Federal Communications Comm'n, 418 F.2d 1153, 1157-58 (D.C.Cir.1969). But here Mollohan has pointed to no specific facts that distinguish it from any other situation in which a party to a § 8(f) agreement might wish to repudiate the agreement. So far as appears, its argument is simply that the "application is critical" in the sense that it is outcome-determinative; obviously an exception for that circumstance would obliterate the rule.
 
 
 19
 The employer also argues that we should apply the Board's pre-Deklewa interpretation of the Act because "this case arose within the jurisdiction of the Fourth Circuit," Employer's Brief at 20, which appears to be the only circuit to resist the Board's attempt to implement its Deklewa interpretation. See Industrial Turnaround Corp. v. NLRB, 115 F.3d 248 (4th Cir.1997). But the argument is to some degree inconsistent with Mollohan's failure to claim that the Deklewa rule is invalid. To the extent that Mollohan asks us to create special circuit law depending on the geographic origins of a case, it asks us — with no precedential support, unsurprisingly — to abandon the federal circuits' normal task of trying to determine federal law as correctly as possible. See, e.g., In re Korean Air Lines Disaster of September 1, 1983, 829 F.2d 1171, 1176 (D.C.Cir.1987) ("The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis. Binding precedent for all is set only by the Supreme Court...."); compare Hill v. Henderson, 195 F.3d 671, 678 (D.C.Cir.1999) (discussing special situation where one circuit's "law of the case" is to be honored by another). Mollohan's other arguments against Deklewa, raised for the first time in its reply brief, are waived.
 
 
 20
 * * *
 
 
 21
 We now turn to the validity of specific clauses in the CBA. First is the preservation-of-work clause.
 
 
 22
 In a very obliquely expressed argument, Mollohan contends that the preservation-of-work clause is invalid because, it says, "it applies ... to work of a type not performed by the Employer." Emp. Br. at 17. Mollohan offers no analysis, merely citing the dissent of Board member Hurtgen from the Board decision, Mollohan, 333 NLRB No. 162, 2001 WL 497324, *2, n. 11., a dissent that in turn simply cites his own dissent in Carpenter's District Council of New York City (Mfg. Woodworkers Ass'n.), 326 NLRB 321, 328-29, 1998 WL 554504 (1998) (Hurtgen dissent), which in turn points us to two other cases, see id. at 328 (Hurtgen dissent) ("The more particularized rationale for my position is to be found in the [Painters District Council 51 (]Manganaro [Corp. Maryland), 321 NLRB 158, 1996 WL 251866 (1996)]dissent and in [Carpenters District Council of Northeast Ohio (]Alessio [Construction), 310 NLRB 1023, 1993 WL 104853 (1993)]."). A litigant must do more than simply point to the beginning of a string of incorporations by reference and ask the court to discern which arguments he seeks to advance. This is particularly true where, as here, the incorporated arguments involve contract language that differs from case to case and in all instances from the text of the clause in this case. In order to prompt a ruling from this court, Mollohan needed to at least make a rudimentary argument explaining how the words of this contract conveyed an illegal meaning. As Mollohan has failed to do so, it would be irresponsible for us to interpret the language. Thus we cannot find that the preservation-of-work clause violates § 8(e).
 
 
 23
 The remaining issue is posed by the successor clause. Its key parts are as follows: In the event the Employer's business is, in whole or in part, sold, leased, transferred, or taken over by sale, transfer, lease, assignment, receivership, or bankruptcy proceedings, such business and operation shall continue to be subject to the terms and conditions of this Agreement for the life thereof.
 
 
 24
 It is understood by this provision that the parties hereto shall not use any leasing or other transfer device to a third party to evade this Agreement....
 
 
 25
 In the event the Employer fails to require the purchase, transferee, or lessee to assume the obligations of this Agreement, the Employer (including partners thereof) shall be liable to the Union, and to the employees covered for all damages sustained as a result of such failure to require assumption of the terms of this Agreement, but shall not be liable after the purchaser, or lessee has agreed in writing to assume the obligations of this Agreement.
 
 
 26
 J.A. at 245-46. Mollohan's complaint, which the Board accepted, is that the clause violates § 8(e) of the Act insofar as it covers leases. Section 8(e) provides in relevant part:
 
 
 27
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void....
 
 
 28
 29 U.S.C. § 158(e). The section is designed to eliminate secondary boycotts, i.e., union attempts to pressure neutral employers to stop doing business with other businesses involved in labor disputes. See National Woodwork Mfrs. Assoc. v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967). Section 8(e) does not, however, reach "primary" provisions, i.e., those encompassing "employees' activity to pressure their employer to preserve for themselves work traditionally done by them." Id. at 635, 87 S.Ct. at 1263 (emphasis added).
 
 
 29
 The Board noted that it "has generally considered a lease to be a form of `doing business' within the meaning of Section 8(e)," and that because the clause applies "regardless of whether the unit employees are retained," it "exceeds the legitimate primary purpose of protecting unit work and is directed at the secondary purpose of furthering union objectives elsewhere." Mollohan, 333 NLRB No. 162, 2001 WL 497324, *2.
 
 
 30
 But the clause in question is a successorship clause, explicitly said to take effect only when "the Employer's business is, in whole or in part" transferred to another entity. Moreover, as the ALJ correctly noted, the clause itself refers to efforts to use a lease transfer "to evade this Agreement." Id. We think it clear that the clause is designed to protect the employees' legitimate and primary interest in retaining the benefits of the CBA in the event of a transfer — as it says — of the "business." The Board's argument that the clause is secondary because it applies "regardless of whether unit employees are retained," Mollohan, 333 NLRB No. 162, 2001 WL 497324, at *2, not only overlooks the clause's limited trigger (transfer in whole or in part of the employer's "business"), but it proves too much, as the same reasoning would doom the sale language, which the Board finds acceptable. We therefore reverse the Board's finding that the leasing language of the successorship clause must be excised as unlawful.
 
 
 31
 * * *
 
 
 32
 Thus we reject all of the employer's claims but grant the union's petition with respect to the successorship clause, and we grant the Board's application for enforcement except with regard to that clause.
 
 
 33
 
 So ordered.