# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued April 11, 2016              Decided June 21, 2016

No. 15-1062

VERIZON NEW ENGLAND INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

LOCAL 2324, INTERNATIONAL BROTHERHOOD OF ELECTRICAL
WORKERS, AFL-CIO,
INTERVENOR

---

Consolidated with 15-1087

---

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

---

*Arthur G. Telegen* argued the cause for petitioner. With him on the briefs was *Sarah K. Hamilton*.

*Joel A. Heller*, Attorney, National Labor Relations Board, argued the cause for petitioner. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate

General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Alfred Gordon O'Connell* argued the cause and filed the brief for intervenor.

Before: HENDERSON, KAVANAUGH, and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH, with whom *Circuit Judge* HENDERSON joins as to all but Parts II-A and II-C-1 and with whom *Circuit Judge* SRINIVASAN joins as to Parts I, II-A, II-B, and II-C-1.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* HENDERSON.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* SRINIVASAN.

KAVANAUGH, *Circuit Judge*: When a union and an employer enter into a collective bargaining agreement, each party may waive certain rights they otherwise would possess under the National Labor Relations Act – for example, the union members' right to picket. In a collective bargaining agreement, the union and employer also may (and often do) agree to have an arbitrator decide disputes arising out of that agreement. The National Labor Relations Board may still review an arbitration decision in certain circumstances when the losing party says it has been deprived of a right otherwise guaranteed by the National Labor Relations Act. But consistent with the national labor policy favoring arbitration, the Board reviews arbitration decisions under a highly deferential standard, known as the *Spielberg-Olin* standard.

This case concerns a collective bargaining agreement between a union and Verizon New England. In the agreement, the union waived its members' right to picket, a right the members otherwise would possess under the National Labor Relations Act. During a subsequent labor dispute, Verizon employees visibly displayed pro-union signs in cars that were parked on Verizon property and lined up so that passers-by would see the signs. Verizon ordered the employees to stop displaying the signs. The union challenged Verizon's action. The legal question was this: Did the collective bargaining agreement's waiver of the union members' right to picket also waive their right to visibly display pro-union signs in cars that were parked on Verizon property and lined up so that passers-by would see the signs?

The collective bargaining agreement between the union and Verizon provided for arbitration of disputes arising out of that agreement. Verizon and the union therefore proceeded to arbitration to resolve their dispute about the signs in the cars. An arbitration panel interpreted the collective bargaining agreement in Verizon's favor. Not satisfied, the union then took the matter to the NLRB. An administrative law judge again ruled in favor of Verizon. The union appealed the matter to the Board. Although the Board reviews arbitration decisions under a highly deferential standard, the Board in a 2-1 ruling overturned this arbitration decision. The Board determined that the union's waiver of its members' right to picket did not waive their right to visibly display pro-union signs in cars on Verizon property.

We conclude that the Board misapplied its highly deferential standard for reviewing arbitration decisions. Under that standard, the Board should have upheld the arbitration decision in this case. The Board acted unreasonably by overturning the arbitration decision.

Therefore, we grant Verizon's petition for review and deny the Board's cross-application for enforcement.

I

A

Section 7 of the National Labor Relations Act guarantees employees the right to engage in certain "concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.[1] Included among the concerted activities protected by Section 7 is the right of employees to visibly display pro-union signs in employees' personal vehicles parked on an employer's property. *See, e.g.*, *International Business Machines Corp.*, 333 N.L.R.B. 215, 219-21 (2001), *enforced*, 31 Fed. Appx. 744 (2d Cir. 2002); *District Lodge 91, International Association of Machinists & Aerospace Workers, AFL-CIO v. NLRB*, 814 F.2d 876, 879 (2d Cir. 1987).

Just as surely as Section 7 protects employees' right to picket and display pro-union signs in their cars, unions may waive that right in a collective bargaining agreement. *See, e.g.*, *American Freight System Inc. v. NLRB*, 722 F.2d 828, 832 (D.C. Cir. 1983) ("It is well settled that a union may

---

[1] That provision provides in full: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." 29 U.S.C. § 157.

lawfully waive statutory rights of represented employees in a collective bargaining agreement."). Absent a waiver, however, Section 8 of the Act makes an employer's violation of a Section 7 right an "unfair labor practice." 29 U.S.C. § 158(a).

B

Verizon New England is a well-known telecommunications provider that services Massachusetts and Rhode Island. It maintains facilities in three towns in Massachusetts: Westfield, Springfield, and Hatfield. Employees at those facilities are represented by the International Brotherhood of Electrical Workers, Local 2324. Verizon New England and Local 2324 were parties to a collective bargaining agreement valid from August 3, 2003, to August 2, 2008.

The parties' collective bargaining agreement provided for arbitration – at the union's option – of disputes arising out of the contract. The agreement stated: "If the Union contends that the intent and meaning of one or more of the Articles of [the] Agreement . . . has been violated by the Company, it may demand arbitration." Joint Appendix at 38. Pursuant to the agreement, arbitration was to be conducted by a three-member Arbitration Board consisting of one representative selected by each party, as well as a mutually agreed-upon neutral arbitrator. The agreement provided that a decision of the Arbitration Board would be "final and binding on the Union and the Company." Joint Appendix at 39.

As relevant here, the collective bargaining agreement also contained a waiver of the union members' right to picket: "The Union agrees that during the term of this Agreement, or any extension thereof, it will not cause or permit its members

to cause, nor will any member of the Union take part in, any strike of or other interference with any of the Company's operations or picketing of any of the Company's premises." Joint Appendix at 42.

In early 2008, a few months before the collective bargaining agreement was to expire, Local 2324 planned to picket Verizon's Westfield, Springfield, and Hatfield facilities. In March 2008, the union prepared for the picketing campaign by distributing pro-union picket signs to employees at those Verizon facilities. The signs were 22 inches by 28 inches and bore pro-union slogans such as "Verizon, Honor Our Existing Contract" and "Honor Our Contract."

Employees at the three locations visibly displayed the signs in the windshields of their cars while the cars were parked on Verizon property. In response, Verizon directed the employees to stop visibly displaying the signs in their cars while on Verizon property. The employees complied. But after Verizon's order to stop displaying the signs, the union filed unfair labor practice charges with the National Labor Relations Board. The union alleged that Verizon had violated its members' Section 7 right to display pro-union signs in their cars.

The Board's Regional Director declined to rule on the charges. The Regional Director did so because, in her view, the dispute arose "from the contract between the parties," and "contractual grievance-arbitration procedures are available for resolving the dispute." Letter from Rosemary Pye, NLRB Regional Director, to Local 2324 (June 18, 2008), Joint Appendix at 56.

The union then submitted to arbitration the issue of whether Verizon had violated the collective bargaining

agreement by requiring the employees to stop displaying the signs in their parked cars.

The arbitration panel ruled for Verizon over the dissent of the union-selected member of the panel. The arbitration panel relied on the provision in the collective bargaining agreement expressly waiving the union members' right to picket. The panel decided that the term "picketing" included the visible display of pro-union signs in the windshields of employees' cars.

Notwithstanding the arbitration panel's reading of the collective bargaining agreement, the Acting General Counsel of the National Labor Relations Board issued a complaint alleging that Verizon had committed an unfair labor practice. The Acting General Counsel alleged that Verizon had violated Section 8 of the National Labor Relations Act by ordering the employees to stop displaying the pro-union signs in their cars.

Under the Board's highly deferential *Spielberg-Olin* standard (as relevant here), the Board will defer to an arbitration award unless the award is "clearly repugnant" to the National Labor Relations Act. *See Olin Corp.*, 268 N.L.R.B. 573, 574 (1984); *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955).

Applying that standard, the Administrative Law Judge upheld the arbitration decision in Verizon's favor. According to the Administrative Law Judge, the arbitration decision was not clearly repugnant to the Act because the contractual term "picketing" could be read to cover the union activities in question here.

The union appealed to the National Labor Relations Board. In a divided 2-1 decision, the Board ruled against

Verizon. Applying the *Spielberg-Olin* standard, the Board concluded that the arbitration decision was "clearly repugnant" to the National Labor Relations Act. The Board stated that the arbitration panel incorrectly concluded that the union's contractual waiver of the right to picket encompassed the right to display pro-union signs in cars. The Board accepted that a union *could* waive its members' Section 7 right to display pro-union signs. But the Board stated that the union did not do so in the collective bargaining agreement at issue here.

The Board ordered Verizon to allow employees to display pro-union signs in their cars. Verizon petitioned this Court for review of the Board's order. The Board cross-applied for enforcement of its order.

Our review is deferential, not de novo. We review the Board's decision for reasonableness, which in this context is sometimes referred to as abuse of discretion review. Put succinctly, the Board's decision must be reasonable and reasonably explained. *See Plumbers & Pipefitters Local Union No. 520 v. NLRB*, 955 F.2d 744, 750 (D.C. Cir. 1992).

II

A

Congress has established that labor arbitration agreed upon by a union and an employer is "the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective-bargaining agreement." 29 U.S.C. § 173(d). At the same time, Section 10 of the National Labor Relations Act authorizes the Board to prevent the commission of "any unfair labor practice" notwithstanding "any other means of adjustment or

prevention that has been or may be established by agreement, law, or otherwise." 29 U.S.C. § 160(a). The NLRB therefore may review labor arbitration proceedings in cases where determining whether an unfair labor practice occurred depends in part on whether a party waived a statutorily protected right in the collective bargaining agreement, which in turn depends on an interpretation of the collective bargaining agreement that the arbitrator previously interpreted.

Under Section 10 of the Act, the Board possesses discretion over how much to defer to arbitration decisions. The standard the Board has long used to review arbitration decisions – the *Spielberg-Olin* standard – is highly deferential to the arbitrator. The Board adopted that highly deferential standard to further the "national policy strongly favor[ing] the voluntary arbitration of disputes." *Olin Corp.*, 268 N.L.R.B. 573, 574 (1984); *see also* 29 U.S.C. § 173(d).

The *Spielberg-Olin* standard calls for Board deference to the arbitrator's decision so long as the following conditions are met: (1) the arbitration proceedings appear to have been fair and regular; (2) all parties agreed to be bound by the arbitration decision; (3) the arbitrator has adequately considered the unfair labor practice at issue; and (4) the arbitrator's decision is not "clearly repugnant" to the National Labor Relations Act. *See Olin Corp.*, 268 N.L.R.B. at 574; *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955); *see also Ralphs Grocery Co.*, 361 N.L.R.B. No. 9, 2014-2015 N.L.R.B. Dec. ¶ 15,843 (July 31, 2014); *Roadway Express, Inc.*, 355 N.L.R.B. 197, 210 (2010); *Turner*

*Construction Co.*, 339 N.L.R.B. 451, 455 (2003); *Mt. Sinai Hospital*, 331 N.L.R.B. 895, 898 (2000).[2]

The only question in this case concerns the fourth *Spielberg-Olin* factor: whether the arbitration decision was "clearly repugnant" to the National Labor Relations Act.

In *Olin*, the Board explained that an arbitrator's decision is not "clearly repugnant" unless the decision is "palpably wrong, i.e., unless the arbitrator's decision is not susceptible to an interpretation consistent with the Act." *Olin Corp.*, 268 N.L.R.B. at 574 (internal quotation marks and footnote omitted). That language in *Olin* is not especially clear, and it has caused some confusion in past cases. The "i.e." in the sentence appears to be the source of the confusion, because what comes after the "i.e." describes a separate way to overturn the arbitrator's decision, not simply an example or another way to describe what comes before the "i.e."

To be clear, therefore, the fourth *Spielberg-Olin* factor establishes two ways in which the Board may overturn an arbitrator's decision as "clearly repugnant to the Act": (i) if the arbitrator interpreted the contract to mean that one party waived a right that may not be waived under the National Labor Relations Act, in which case the "arbitrator's decision" is deemed "not susceptible to an interpretation consistent with the Act"; or (ii) if the arbitrator interpreted the contract in a "palpably wrong" manner and thereby deprived the losing party of a right otherwise guaranteed under the Act.

---

[2]  In December 2014, the Board announced a new, less deferential standard of review to be applied prospectively only. *See Babcock & Wilcox Construction Co.*, 361 N.L.R.B. No. 132, 201 L.R.R.M. (BNA) 2057 (Dec. 15, 2014). Because this case was pending when the new policy was announced, the Board applied its *Spielberg-Olin* deference standard rather than the new standard.

B

An arbitration decision is "not susceptible to an interpretation consistent with the Act" when an arbitrator interprets a contract to mean that one party waived a right that may not be waived under the National Labor Relations Act. *See, e.g.*, *I.R.S. v. Federal Labor Relations Authority*, 963 F.2d 429, 440 & n.13 (D.C. Cir. 1992); *Plumbers & Pipefitters Local Union No. 520 v. NLRB*, 955 F.2d 744, 754, 756 (D.C. Cir. 1992); *see also* Harry T. Edwards, *Deferral to Arbitration and Waiver of the Duty to Bargain: A Possible Way Out of Everlasting Confusion at the NLRB*, 46 OHIO ST. L.J. 23, 30 (1985).

Put the other way, an arbitration decision finding waiver of a right protected by the Act is deemed "susceptible to an interpretation consistent with the Act" so long as the right at issue in the arbitration proceeding may be waived under the Act. *See Plumbers & Pipefitters*, 955 F.2d at 756 ("[W]here the statutory right implicated by a grievance settlement is within the category of waivable rights . . . then it is unclear why the Board would ever have any choice but to give deference, at least so long as the grievance procedures through which the settlement is reached are fair and regular and the union has not breached its duty of fair representation.") (emphasis and internal quotation marks omitted).

Therefore, to determine whether an arbitration decision is "susceptible to an interpretation consistent with the Act," the Board's task is straightforward: The Board must ask only whether the Act permits the Section 7 right at issue to be waived in a collective bargaining agreement. If the answer to that question is yes, then an arbitrator's conclusion that the

parties to a contract had, in fact, waived that Section 7 right is necessarily "susceptible to an interpretation consistent with the Act."

In this case, that inquiry is simple. All agree that the National Labor Relations Act allows a union to waive its members' Section 7 right to display pro-union signs in vehicles parked on company property. Here, the arbitration panel determined that the union did in fact waive that right. The arbitration decision, therefore, was susceptible to an interpretation consistent with the Act.

## C

### 1

Verizon claims that this conclusion – namely, that the union waived a waivable statutory right – is the end of the inquiry under the "clearly repugnant" prong of the *Spielberg-Olin* standard. We disagree. As we read the Board's precedents, the *Spielberg-Olin* standard allows another (albeit narrow) way to show that an arbitration decision is "clearly repugnant to the Act": if the arbitrator interpreted the contract in a "palpably wrong" manner and thereby deprived the losing party of a right otherwise guaranteed under the Act.

What does "palpably wrong" mean? The phrase means what it suggests. Wrong is not enough. The adverb matters. Egregiously wrong, clearly erroneous, badly flawed, totally wrong, jumping the rails. Whatever the exact verbal formulation – we will use "egregiously wrong" – the basic idea remains the same: The Board must afford great deference to the arbitrator's interpretation of the contract. *See, e.g.*, *Motor Convoy, Inc.*, 303 N.L.R.B. 135, 137 (1991); *U.S. Postal Service*, 275 N.L.R.B. 430, 432 (1985)

(arbitration decision that does not comport precisely with Board precedent is not "palpably wrong").[3]

To state the obvious, the fact that the Board might read a contract term differently than the arbitrator read it does not suffice to make an arbitration decision "palpably wrong." Rather, as the Board has previously stated, its highly deferential standard of review "recognizes that the parties have accepted the possibility that an arbitrator might decide a particular set of facts differently than would the Board. This possibility, however, is one which the parties have voluntarily assumed through collective bargaining." *Andersen Sand & Gravel Co.*, 277 N.L.R.B. 1204, 1205 n.6 (1985); *see also Dennison National Co.*, 296 N.L.R.B. 169, 170 (1989).

---

[3] The Board's "palpably wrong" standard is similar to (although perhaps a notch less deferential to the arbitrator than) the extraordinarily deferential standard applied by federal courts reviewing arbitration decisions directly under Section 301(a) of the Labor Management Relations Act. 29 U.S.C. § 185. Consistent with the national policy favoring labor arbitration, a federal court "presiding over a § 301 proceeding seeking enforcement of an arbitrator's award must give the award the greatest deference imaginable – the award must be enforced so long as the arbitrator purports to be interpreting the contract rather than dispensing 'his own brand of industrial justice.'" *Utility Workers Union of America, Local 246, AFL-CIO v. NLRB*, 39 F.3d 1210, 1216 (D.C. Cir. 1994) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)); *see also National Postal Mail Handlers Union v. American Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009) (The "question is whether the arbitrator was even arguably construing or applying the contract.") (internal quotation marks omitted); *National Football League Management Council v. National Football League Players Association*, No. 15-2801, 2016 WL 1619883 (2d Cir. Apr. 25, 2016).

To be sure, we ourselves review *the Board's decision* under a deferential standard. We may overturn the Board's decision only if the Board abused its discretion (that is, acted unreasonably) in failing to afford the required deference to the arbitration decision. *Plumbers & Pipefitters*, 955 F.2d at 750; *American Freight System Inc. v. NLRB*, 722 F.2d 828, 832 (D.C. Cir. 1983).

2

Here, the Board should have upheld the arbitration decision. The arbitration decision was far from egregiously wrong. No hard-and-fast definition of the term "picketing" excludes the visible display of pro-union signs in employees' cars rather than in employees' hands, especially when the cars are lined up in the employer's parking lot and thus visible to passers-by in the same way as a picket line. Indeed, the Board's own case law on picketing has concluded that the term may, under certain circumstances, extend to the display of stationary signs – whether in employees' cars, positioned near an entrance to a job site, or even planted in snowbanks – on or near the employer's property. *See United Mine Workers of America, District 2*, 334 N.L.R.B. 677, 686 (2001); *Ironworkers District Council of the Pacific Northwest*, 292 N.L.R.B. 562, 571-76 (1989); *Construction & General Laborers Union, Local 304*, 260 N.L.R.B. 1311, 1316, 1319 (1982); *Lawrence Typographical Union No. 570*, 169 N.L.R.B. 279, 282-84 (1968); *Local 182, International Brotherhood of Teamsters*, 135 N.L.R.B. 851, 856-57 (1962).

In short, there was nothing approaching *egregious* error in the arbitration panel's decision to interpret the ban on picketing to encompass the visible display of picket signs in employees' cars on Verizon property. Under a reasonable

application of the *Spielberg-Olin* standard, the Board should have upheld the arbitration panel's decision.

* * *

Under the *Spielberg-Olin* standard, the arbitration panel's decision in this case was not clearly repugnant to the Act. First, the arbitration panel's decision was susceptible to an interpretation consistent with the Act, because under the Act unions may waive their members' right to display signs in cars on the employer's premises. And second, the arbitration panel's decision was not a "palpably wrong" interpretation of the collective bargaining agreement. The Board's contrary decision was unreasonable. We grant Verizon's petition for review and deny the Board's cross-application for enforcement.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, concurring in part and concurring in the judgment: I join Judge Kavanaugh in granting Verizon New England's petition for review but write separately to express my doubt about the arbitration deferral standard of the National Labor Relations Board (Board) as described in the majority opinion. For several reasons, I do not agree that "what comes after the 'i.e.' describes a separate way to overturn the arbitrator's decision" instead of "simply an example or another way to describe what comes before." Maj Op. 10. To begin with, this construction deviates from the term's ordinary definition— "i.e." is short for the Latin *id est*, meaning "that is"; not "or" or "alternatively" as my colleagues apparently have it. Second, their construction does not comport with the court's ordinary usage, by which the term restates what is said before. *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 135 (2009) ("intentionally relinquished or abandoned, *i.e.*, affirmatively waived"); *United States v. Cotton*, 535 U.S. 625, 630 (2002) ("jurisdiction . . ., *i.e.*, the courts' statutory or constitutional power to adjudicate the case" (internal quotations and emphasis omitted)). Third—and, in my view, most salient— we should not give our own interpretation of what Board "orders do not say" when the Agency itself has not subsequently done so. *Phila. Gas Works v. FERC*, 989 F.2d 1246, 1250–51 (D.C. Cir. 1993) ("FERC, not we (or FERC's appellate lawyers), must" perform task); *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943). Tellingly, the majority opinion cites no Board authority for its interpretation of the Board's use of "palpably wrong." I submit that we should ask only whether the arbitrator's decision is susceptible of an interpretation consistent with the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151 *et seq*. The right to picket is a waivable right and we have no independent reason to think waiver inconsistent with the NLRA; the arbitrator's conclusion that it was waived, then, passes muster and our inquiry should be at an end.

2

But more importantly, my colleagues ignore the two-ton elephant in the room, namely, *what* arbitration deferral standard the Board may lawfully apply. May the Board, for instance, reject the arbitrator's interpretation of a collective bargaining agreement (CBA) because the Board would not have reached the same conclusion in the first instance? In the past the Board said no, recognizing "that national policy strongly favors the voluntary arbitration of disputes." *Olin Corp.*, 268 N.L.R.B. 573, 574 (1984). Accordingly, it rejected only "palpably wrong" or "clearly repugnant" arbitral interpretations of a CBA. *Id.* (ALJ's failure to defer to arbitration award "frustrate[d] the declared purpose of [Board policy] to recognize the arbitration process as an important aspect of the national labor policy favoring private resolution of labor disputes.").

This standard—although nebulous—tracks our own standard of review of arbitration decisions. *See* Maj. Op. 13 & n.3 ("The Board's 'palpably wrong' standard is similar to (although perhaps a notch less deferential to the arbitrator) the extraordinarily deferential standard" we apply). When the court is the forum of first review, it enforces the arbitrator's CBA interpretation "so long as the arbitrator purports to be interpreting the contract rather than dispensing 'his own brand of industrial justice.' " *Utility Workers Union of Am. v. NLRB*, 39 F.3d 1210, 1216 (D.C. Cir. 1994) (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). Under that review, "whether the arbitrator erred—or even seriously erred—in interpreting the contract" is irrelevant. *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009). *See also Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, No. 15-2801, 2016 WL 1619883, at *6 (2d Cir. Apr. 25, 2016) (if arbitrator "misinterprets the parties' agreement," court cannot "substitute [its] own"

interpretation (citing *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 37–38 (1987))).[1] But the Board has recently jettisoned this standard. It now appears to defer to the arbitrator's CBA interpretation only if "Board law reasonably permits" it. *Babcock & Wilcox Constr. Co.*, 361 N.L.R.B. No. 132, 2014 WL 7149039, at \*11 (Dec. 15, 2014).[2] If the "Board law" standard in fact replaces the old one, it presents the paradox of a Board decision "against deferring to an arbitrator's award" in a setting "when a federal court would have been obliged to enforce" it. *See Utility Workers*, 39 F.3d at 1216 (forewarning of paradox). If the Board applies its new standard, "both an arbitrator's award

---

[1] The standard also furthers one goal of the Labor Relations Management Act (LRMA), 29 U.S.C. §§ 141 *et seq.*, by which the Congress established that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement," 29 U.S.C. § 173(d); *see also United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578 (1960) ("A major factor in achieving [the federal policy of] industrial peace is the inclusion of a provision for arbitration of grievances in the collective bargaining agreement.").

[2] Parenthetically, it is not plain what "Board law" in fact bears on contract interpretation. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 201 (1991) ("[T]he Board is neither the sole nor the primary source of authority in [contract interpretation]. Arbitrators and courts are still the principal sources of contract interpretation." (internal quotation marks omitted)); *Honeywell Int'l, Inc. v. NLRB*, 253 F.3d 119, 124 (D.C. Cir. 2001) ("[T]he Board may interpret a contract 'only so far as necessary to determine' what statutory rights the party has given up by agreeing to a particular contract." (quoting *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 428 (1967))).

and a conflicting Board order" could—inconsistently—be "enforced simultaneously in the federal courts." *Id.*

If the Board continues to second guess the substance of the arbitrator's CBA interpretation as opposed to, say, only his choice of remedy, the paradox will become inevitable. To me, it is plain that the Board's inquiry whether "Board law reasonably permits" an interpretation is irreconcilable with our review of whether the arbitrator dispensed his "own brand of industrial justice." *Id.* When the time comes, I believe the Board will have to explain why we should accord *its* decision any deference when it fails to defer to an arbitrator's conclusion, to which *our* "extraordinarily deferential standard," *Nat'l Postal*, 589 F.3d at 441, must be applied. *See BP Amoco Corp. v. NLRB*, 217 F.3d 869, 873 (D.C. Cir. 2000) (court applied *de novo* review to labor contract, rejecting Board's interpretation); *accord Litton*, 501 U.S. at 203 ("We would risk the development of conflicting principles were we to defer to the Board in its interpretation of the contract, as distinct from its devising a remedy for the unfair labor practice that follows from a breach of contract. We cannot accord deference in contract interpretation here only to revert to our independent interpretation of collective-bargaining agreements in a case arising under [the LRMA].").[3]

---

[3] My colleagues conclude that we may "overturn the Board's decision only if the Board abused its discretion (that is, acted unreasonably) in failing to afford the required deference." Maj. Op. 14; *see also* Dissent Op. 1 (same). Granted, we ordinarily review the Board's application of its arbitration deferral standard in this manner. *See Am. Freight Sys. Inc. v. NLRB*, 722 F.2d 828, 832 (D.C. Cir. 1983). But here the Board was engaged in contract interpretation*, see* Maj. Op. 13 (discussing whether Board may "read a contract term differently than the arbitrator read it."), and

5

we have said time and again that we accord the Board *no* deference when it is so engaged. *See, e.g.*, *McDonnell Douglas Corp. v. NLRB*, 59 F.3d 230, 234 (D.C. Cir 1995) ("courts owe no deference to the Board in its interpretation" of CBA (internal quotations omitted)); *Int'l Union of Painters & Allied Trades v. NLRB*, 309 F.3d 1, 3 (D.C. Cir. 2002) ("Board interpretations of the CBA . . . receive no deference"). My colleagues make no attempt to reconcile these conflicting standards; as we must ensure that "[a]rbitrators and courts"—not the Board—remain "the principal sources of contract interpretation," *Litton*, 501 U.S. at 201, however, it seems plain to me that "the normal deference we must afford the Board's policy choices does not apply *in this context*," *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 837 (D.C. Cir. 2005) (emphasis added), *i.e.*, when the Board reinterprets a contract under its arbitration deferral standard, our abuse of discretion approach should yield.

SRINIVASAN, *Circuit Judge*, concurring in part and dissenting in part: The underlying question in this case is whether the union, in its collective bargaining agreement with Verizon, waived the statutorily protected right of employees to engage in the conduct at issue: to leave pro-union signs displayed in the window of their cars in a company parking lot while at work. The relevant provision of the collective bargaining agreement waived the employees' right to engage in "picketing." An arbitration panel, in a divided decision, found that the unattended display of pro-union signs in parked cars while at work constituted "picketing." A dissenting arbitrator strongly disagreed. The Board overturned the arbitration majority's decision, and we now assess whether the Board acted permissibly in doing so.

I concur fully in the court's explanation of the legal standards under which the Board reviews an arbitration decision's interpretation of a collective bargaining agreement. As the court sets out, one situation in which the Board may set aside an arbitration decision is if an arbitrator reaches a "palpably wrong" conclusion that the agreement waives employees' statutory right to engage in the conduct at issue. *Ante*, at 12-13. The "palpably wrong" standard is self-evidently a deferential one. But if the Board, applying that deferential standard, concludes that an arbitrator's interpretation is palpably wrong, we in turn apply a deferential standard in reviewing the Board's decision. As the court explains, we overturn the Board's decision only if it is an abuse of discretion—that is, only if it is unreasonable. *Ante*, at 14.

My sole (and narrow) disagreement with the court concerns the application of that deferential standard in the specific circumstances of this case. In my respectful view, the Board's decision was not unreasonable in setting aside the arbitration decision.

The arbitration majority determined that, when Verizon employees left unattended signs in the windows of their cars in company parking lots while they went about their workday, the employees were engaged in "picketing." According to the arbitration majority, "placing signs in cars" amounts to "picketing" because it "communicates a message." J.A. 305. The Board could reasonably conclude otherwise. As the Supreme Court has explained, although written communications "may convey the same information" as workers "patrolling a picket line," the "loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word." *Hughes v. Superior Court*, 339 U.S. 460, 465 (1950). Picketing thus is "qualitatively different from other modes of communication." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 580 (1987) (internal quotation marks and quotation omitted).

The Board, for that reason, could find it wrong to deem the unattended display of signs in parked cars to be "picketing." But could the Board find it *palpably* wrong to do so? That is by definition a closer question. I think that, under our deferential standard of review, it was at least reasonable for the Board to find the arbitration majority's interpretation of "picketing" to be palpably wrong. In other words, it was at least reasonable for the Board to find the dissenting arbitrator to be palpably correct.

The Board has long held that a "necessary condition[] of 'picketing' is a confrontation in some form between union members and [persons] trying to enter the employer's premises." *Chi. Typographical Union No. 16*, 151 N.L.R.B. 1666, 1669 (1965) (quoting *NLRB v. United Furniture Workers of Am.*, 337 F.2d 936, 940 (2d Cir. 1964)). The Board could reasonably conclude that, when union members

leave signs behind in their parked cars and enter the workplace for the day, they plainly are not engaged in the sort of personal "confrontation" with passersby in the parking lot that could be considered "picketing." *See id.* (finding that patrolling while carrying placards in shopping centers and public buildings lacked the "element of confrontation" necessary to constitute picketing). To be sure, picketers might occasionally set down their signs while taking a temporary break or while sitting nearby in their cars to avoid rainfall. *See, e.g.*, *Constr. & Gen. Laborers Local 304*, 260 N.L.R.B. 1311, 1316 (1982); *Gen. Serv. Emps. Union Local 73*, 239 N.L.R.B. 295, 302 (1978); *Lawrence Typographical Union No. 570*, 169 N.L.R.B. 279, 282-83 (1968); *Local 182, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 135 N.L.R.B. 851, 856 & n.6 (1962). But here, the employees left their signs entirely unattended in their cars, and they then went to work. I am unaware of any decision considering employees to be engaged in picketing even while in the workplace carrying out their normal functions.

In those circumstances, I believe the Board reasonably found the arbitration majority's interpretation of the "picketing" prohibition to be palpably wrong. The Board may not have been compelled to reach that conclusion, and the Board perhaps also would have acted reasonably had it sustained the arbitration decision rather than overturned it. In adopting the latter course, though, the Board, in my respectful view, did not abuse its discretion.