2026 IL App (1st) 242531

FIFTH DIVISION
June 26, 2026

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

No. 1-24-2531

| | | |
|---|---|---|
| THE CITY OF CHICAGO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Petition for Review of a Decision |
| v. | ) | and Order of the Illinois Labor |
| | ) | Relations Board, Local Panel |
| FRATERNAL ORDER OF POLICE, LODGE 7; | ) | |
| POLICEMEN'S BENEVOLENT AND PROTECTIVE | ) | |
| ASSOCIATION, UNITS A, B, & C; and THE | ) | Illinois Labor Relations Board |
| ILLINOIS LABOR RELATIONS BOARD, LOCAL | ) | Case No. L-CA-22-008 |
| PANEL, | ) | |
| | ) | |
| Respondents. | ) | |

JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Johnson and Wilson concurred in the judgment and opinion.

**OPINION**

¶ 1    The City of Chicago (City) has petitioned this court for direct administrative review, pursuant to section 11(e) of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/11(e) (West 2024)), of a final decision and order of the Illinois Labor Relations Board, Local Panel (Board). The Board found that, while the City had no obligation to bargain over its implementation of a COVID-19 vaccination policy, it committed unfair labor practices, as defined in section 10(a) of the Act (*id.* § 10(a)), when it did so without fully bargaining the effects of that policy with the respondent police unions, the Fraternal Order of Police, Lodge 7 (FOP), and the Policemen's Benevolent and Protective Association, Units A, B, & C (PBPA) (collectively, the Unions). The Board also found that the City failed to provide the Unions with information they had requested in

connection with the parties' negotiations.

¶ 2    For the reasons that follow, we conclude that, in the specific context of this COVID-19 pandemic and the urgency to implement the vaccination policy quickly, where the Unions simultaneously filed both contract grievances and unfair labor practice charges in an effort to stop, delay, or derail the policy and continued to come to the arbitrator in the grievance proceedings for his decision on numerous implementation questions, the Board's failure to defer to those decisions was an abuse of its discretion. We reverse the Board's final decision and order.

¶ 3                                I. BACKGROUND

¶ 4    FOP is the exclusive collective bargaining representative of sworn Chicago Police Department (CPD) personnel below the rank of sergeant. FOP and the City were parties to a collective bargaining agreement (CBA), effective from July 1, 2012, to June 30, 2017, that was modified and extended through June 30, 2025. PBPA is the exclusive collective bargaining representative of CPD personnel holding the rank of sergeant, lieutenant, or captain. PBPA and the City were parties to a CBA, effective July 1, 2016, through June 30, 2022, that, per its provisions, continued in effect during all times relevant here as those parties remained in negotiations over a successor agreement.

¶ 5    The Act prohibits the Unions' members, as police force personnel, from striking and provides for interest arbitration if they cannot resolve an issue with the City through negotiations. *Id.* § 14(m).

¶ 6    On August 25, 2021, the City announced its intention to implement a policy requiring all City employees to be vaccinated against COVID-19 or undergo twice-weekly testing at their own expense, with the testing option to remain available after December 31, 2021, only for individuals with medical or religious exemptions. The policy provided that employees who failed to report

their vaccination status by October 15, 2021, or be vaccinated by December 31, 2021, would be placed on nondisciplinary, no-pay status. The City submitted the draft policy to the Unions for discussion, and negotiations were conducted in August, September, and early October of 2021.

¶ 7     The City's position at that time was that it would bargain over the effects of the policy but that it clearly had the right under the CBAs to implement the policy unilaterally. The Unions maintained that both the policy itself and its effects were subjects of mandatory bargaining. The Unions issued twelve requests for documents and information regarding the hazards that had prompted the City to adopt the policy, what it had done to mitigate those hazards, its reasons for exempting contractors, how it planned to compensate employees who contracted COVID-19, its process for reviewing religious exemptions, how many officers had already been vaccinated or contracted COVID-19, and the manner in which those who had contracted it had been compensated. The parties had met in person on August 24, 2021, before the draft policy was provided, and they discussed it again by telephone on August 27, 2021. The City responded to the Unions' information requests on September 1 and 7, 2021, stating that it would "continue to provide information as it [became] available."

¶ 8     On September 27, 2021, the Unions sent the City a counterproposal to the vaccination policy that, instead of requiring officers to be vaccinated, suggested testing, masking, physical distancing in work areas, educational training on the importance of vaccination, and financial incentives for those willing to be vaccinated. The parties met that day and again on October 1, 2021, when the City presented the Unions with a revised vaccination policy. At the parties' next meeting, on October 7, 2021, the Unions verbally presented the City with a list of 15 effects-bargaining issues they wished to negotiate. They sent the City a follow-up e-mail that same day stating that the meeting had been productive and that they believed there were areas on which an

agreement could be reached. They requested an extension of the October 15, 2021, implementation date to allow for further negotiations.

¶ 9    The next day, October 8, 2021, the City notified its employees that it was implementing the vaccination policy, effective immediately. It responded in writing that evening to the effects-bargaining issues raised by the Unions and rejected the Unions' request to delay the policy's implementation. In exchanges that took place over the next few days, the City made clear that it was willing to continue meeting to discuss the Unions' concerns but that it was moving forward with the policy. On October 12, 2021, the City sent the Unions a revised vaccination policy making certain concessions that it represented as its "Last, Best and Final" offer. The Unions responded by requesting that the City inform them by the close of business the following day if it was willing to engage in midterm interest arbitration pursuant to the terms of their respective CBAs.

¶ 10    On October 13, 2021, the Unions filed the unfair labor practice charge that is the subject of this appeal. As later amended and incorporated into the complaint for hearing issued by the Board's executive director on December 1, 2022, it alleged that the City had violated section 10(a) of the Act (see *id.* § 10(a)(1), (4)) by failing and refusing to bargain in good faith over both the decision to implement the vaccination policy and the policy's effects and by refusing to respond completely to the Unions' August 2021 requests for information.

¶ 11    On the following day, the Unions also filed grievances alleging the city violated the terms of their respective CBAs by implementing the vaccination policy. The circuit court granted the Unions' request for a stay preventing the City from implementing the policy pending completion of the grievance arbitration, and a four-day hearing on the grievances was held before arbitrator George Roumell on December 29 and 30, 2021, and January 3 and 4, 2022.

¶ 12    The Unions continued to request and receive information from the City, and the parties

4

continued to negotiate various issues through November 2021.

¶ 13    On December 21, 2021, the City filed a motion asking the administrative law judge (ALJ) presiding over the unfair labor practice claims to defer to the complaint in the grievance arbitration, to which the Unions responded. On January 27, 2022, the ALJ issued a recommended decision and order concluding that the Board should defer to the arbitrator on *all* of the Unions' failure-to-bargain allegations (both over the decision to implement the policy and its effects), leaving the Board to decide only the allegations regarding the City's refusal to fully respond to requests for information.

¶ 14    The arbitrator denied the Unions' grievances. He concluded that the City's implementation of a COVID-19 vaccine mandate and reporting requirement was, under the circumstances presented in the extensive medical testimony, a reasonable exercise of its powers under the management rights clauses in the CBAs and therefore not subject to the interest arbitration provisions in those agreements. The arbitrator found that the City had "clearly establish[ed] that the Covid pandemic had a significant impact on the health and safety of the Officers as well as the Department's ability at any given time to staff its various Units with healthy Officers at levels the Department deem[ed] necessary to fulfill its function in serving the public."

¶ 15    Turning to "the nature and scope of the award," the arbitrator first established new compliance dates. The Unions' members would be required to receive their first injection of the vaccine by March 13, 2022, and their second by April 13, 2022. The CPD could extend those deadlines, on a case-by-case basis, for members who established that they had made a good-faith attempt to comply but could not obtain an appointment, with disputes over whether good cause was shown or the reasonableness of any extension to be decided by the arbitrator. The arbitrator also determined that employees who were unable to report to work due to adverse reactions to the

5

vaccine would receive the same sick leave benefits as for other ailments.

¶ 16    The arbitrator went on to address a number of the Unions' concerns regarding the effects of the policy. He concluded that the provisions concerning religious and medical accommodations, which had been vigorously debated by the parties, were reasonable and resolved certain issues concerning those provisions, including the time within which a member who was denied an accommodation needed to comply and whether the policy was in keeping with the law governing individuals who refuse to be vaccinated. The arbitrator concluded the record was insufficient to decide whether the time within which personal days awarded to members who were fully vaccinated by October 15, 2021, should be extended, concluding that was a matter best resolved through further discussions between the parties. The arbitrator gave the CPD 14 days to submit a plan for how it would safeguard the personal health information of members when awarding personal days, with any disputes to again be decided by the arbitrator.

¶ 17    The arbitrator then considered whether the actions the CPD had taken to enforce the policy were permitted under the disciplinary provisions in the CBAs. He concluded that the CPD's process for ascertaining vaccination compliance was not discriminatory, that it had not violated the CBAs by placing members who refused to report their vaccination status on no-pay status, and that officers could not use banked or accrued time to continue their in-pay status.

¶ 18    The arbitrator noted that, shortly after the October 15, 2021, deadline for officers to enter their vaccination status in the City's vaccination portal, the CPD had implemented a three-step process for dealing with officers who had not complied with that requirement. Officers were first ordered to appear for a counseling session with human resources and were read a statement reminding them of the reporting obligation. If they refused to comply, they were directed to turn over their stars, shields, and vehicle keys and were placed on no-pay status. They were again asked

to comply and, if they still refused, were given a direct order to comply and advised that their continued refusal would subject them to disciplinary action for disobeying a direct order that could result in their separation from the police department. The arbitrator recognized that this represented a failure by the CPD to abide by the City's announced policy and reserved jurisdiction to resolve future disciplinary disputes, including those stemming from failures to obey direct orders.

¶ 19    Because it was unclear whether and how the City's masking policy would continue or whether testing would be part of the vaccine mandate, the arbitrator ordered the parties to engage in at least one negotiation to clarify or resolve that issue and to report back, so that he could decide whether a supplemental award was needed on "the reasonableness of the vaccine mandate policy as applied to th[o]se two situations."

¶ 20    Although the arbitrator would exercise continuing jurisdiction "to resolve any issues raised by the parties concerning [the] Award or the subject matter of th[e] dispute," including the discipline of officers put on no-pay status, he emphasized that he was "not deciding any pending unfair labor practices between the parties." "[N]or [wa]s he acting as an interest arbitrator." His authority was "limited to interpreting the respective collective bargaining agreements at issue."

¶ 21    Over the next year-and-a-half, between March 2022 and September 2023, the arbitrator would issue four supplemental opinions and awards, concerning primarily the reinstatement of officers from no-pay to paid status upon compliance with the reporting requirement and disciplinary actions short of separation. On April 11, 2022, for example, the arbitrator would review several reports provided by counsel for FOP detailing disciplinary actions taken against officers who failed to report their vaccination status. Noting again that the CPD was taking a different approach than that set out in the City's policy but also noting the unique circumstances of this "once-in-a-lifetime pandemic," the arbitrator would fashion a supplemental award that

7

balanced the approach set forth in the policy with the CPD's interest in obtaining compliance with its direct orders.

¶ 22     The arbitrator would note, on September 12, 2023, that, "although there were references to proceedings before the Illinois Labor Board, the Board ha[d] not issued any final decision which could guide this Arbitrator" on matters relevant to his supplemental awards. In some of those awards, the arbitrator made clear that he was addressing issues with the City's enforcement of the policy that had been raised by one or both of the Unions. The Unions continued to present issues to the arbitrator through 2023, even after the ALJ, in January 2023, had resumed hearings on the Unions' charges that the City had failed to bargain over the effects of the policy. Because in most instances the matter in question was resolved "without either party completely prevailing in their positions," the arbitrator generally ordered the parties to share in the payment of his fees.

¶ 23     The only indication in the record of an instance where the arbitrator declined to exercise jurisdiction is in reference to the City's decision to terminate a small number of police officers because, as the arbitrator noted, the CBA required that termination decisions be heard by the Chicago Police Board.

¶ 24     The Unions unsuccessfully moved to vacate the arbitrator's initial award in the circuit court, on the basis that it "constitute[d] a violation of one or more explicit, clearly defined, and dominant public policies of the State of Illinois" (internal quotation marks omitted) (*Fraternal Order of Police, Chicago Lodge No. 7 v. City of Chicago*, 2022 IL App (1st) 220346-U, ¶ 20), and we affirmed that denial on November 4, 2022 (*id.* ¶ 44). In doing so, we recognized that our review of an arbitrator's award was extremely limited (*id.* ¶ 27) and "express[ed] no opinion as to whether the Unions could succeed on unfair labor practice charges before the Board" (*id.* ¶ 42).

¶ 25     Proceedings before the Board on the unfair labor practice claims, which were stayed

pending the outcome of the Unions' appeal from the arbitration award, moved forward in January 2023. The parties had filed exceptions to the ALJ's deferral order, and those exceptions were still pending before the Board. The Board did not review that decision, however, concluding instead that the ALJ should now consider deferral under the postarbitration award deferral standard set out in *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), rather than the preaward standard in *Dubo Manufacturing Corp.*, 142 N.L.R.B. 431 (1963).

¶ 26    On February 27, 2023, the ALJ issued a new order applying the *Spielberg* standard and, this time, recommending deferral to the arbitrator's award only on the question of the City's decision to implement the vaccination policy, which it found distinct from the effects of the policy. The ALJ concluded that the Unions' claims regarding the City's failure or refusal to bargain over the policy's effects would remain with and be decided by the Board, along with their claims regarding the failure to provide information, which had not previously been subject to deferral.

¶ 27    The parties proceeded on a stipulated record in lieu of a hearing, and on May 15, 2024, the ALJ issued her 61-page final recommended decision and order in this matter. She concluded that the City had violated the Act by implementing the vaccination policy without first reaching agreement or proceeding through impasse and interest arbitration on a number of what she concluded were the distinct and bargainable effects of the policy's implementation, including consequences for noncompliance, the policy's implementation date, paid time off for vaccinated employees, injury-on-duty status for employees suffering side effects from vaccination, indemnification of medical expenses resulting from obtaining the vaccine, who would bear the cost of testing, and incentives for encouraging compliance. In the ALJ's view, these implementation decisions were severable from the City's permitted decision to require vaccination. The ALJ determined that the Unions had sought to bargain over these "effects," that

the parties' agreements did not constitute a waiver of their right to do so, and that the City had impermissibly implemented the vaccination policy and made decisions regarding its effects before completing the requisite bargaining process, including interest arbitration if necessary.

¶ 28     The ALJ concluded that the City had also violated the Act by unilaterally (1) changing the consequences for failing to report vaccination status, (2) eliminating the testing requirement for unvaccinated employees, and (3) rescinding its existing masking requirement. And it had further violated the Act by failing to substantively or adequately respond to the Unions' August 25, 2021, information requests, including those seeking information regarding how the City had intended at that time to deal with contractors, how it would compensate or pay the medical expenses of officers who contracted COVID-19, and how it would determine eligibility for religious exemptions.

¶ 29     Finally, the ALJ addressed the renewed request for deferral to arbitration under *Spielberg* that the City had raised in its briefing, where it had brought to her attention several supplemental awards made by the arbitrator since she had first considered *Spielberg* deferral. The ALJ believed that request was procedurally improper because she had already ruled and, in her view, Board rules did not allow for repeated deferral motions.

¶ 30     The City's exceptions to the ALJ's recommended decision and order were fully briefed, and the Board took the matter under advisement, issuing its final decision and order adopting the ALJ's findings, conclusions, and recommendations in full on November 14, 2024. The Board noted that the City's primary objection was to the denial of its renewed motion to defer to the arbitrator's award on the Unions' effects-bargaining allegations. The Board was unpersuaded that the ALJ had wrongfully denied that motion on procedural grounds and, with the arbitrator's subsequent awards before it, found nothing in the City's renewed request that "sufficiently militate[d] against" accepting the ALJ's "thorough and well-reasoned findings" against deferral.

¶ 31    The Board concluded that the City's exceptions to the ALJ's findings and conclusions on the merits of the Unions' claims that the City had violated the Act by failing to engage in effects bargaining and inadequately responding to requests for information also compelled no different result. The Board noted that it had already considered and rejected such arguments in *Coalition of Unionized Public Employees*, 40 PERI ¶ 74 (ILRB Local Panel 2023) (*COUPE*), where similar challenges to the City's vaccination policy had been brought by other unions.

¶ 32    Finally, the Board adopted the ALJ's proposed remedy, a "make whole" order rescinding the vaccination policy and unwinding any disciplinary effects on the Unions' members for failing to comply with it, including the expungement of personnel records, reinstatement of terminated employees, and the payment, with interest, of any lost pay and benefits.

¶ 33    The City now appeals.

¶ 34                                    II. JURISDICTION

¶ 35    The Board issued its final decision and order in this matter on November 14, 2024, and the City filed its notice of appeal on December 18, 2024, within 35 days of the Board's decision. We have jurisdiction under Illinois Supreme Court Rule 335 (eff. July 1, 2017) and section 3-113 of the Administrative Review Law (735 ILCS 5/3-113 (West 2024)), which govern direct appellate review of administrative orders, and section 11(e) of the Act (5 ILCS 315/11(e) (West 2024)), which provides for such review where, as here, the Board has granted or denied relief sought in connection with a claimed unfair labor practice.

¶ 36                                    III. ANALYSIS

¶ 37    The City argues on appeal that (1) the Board should have deferred to the arbitrator's decision on the Unions' claims that the City failed to bargain over the effects of the vaccination policy, (2) the Unions waived bargaining over the effects of the policy, and (3) the Board erred by

finding the City violated the Act. Because we agree with the City that the Board should have deferred to the arbitration awards on the Unions' effects-based failure-to-bargain claims, there is no need for us to consider whether the Unions may have waived those claims. We also agree with the City that it was clear error for the Board to find unfair labor practices based on a failure to provide information.

¶ 38           A. Denial of the City's Motion to Defer This Case to Arbitration

¶ 39    The City first argues that the Board should have deferred in full to the arbitration award, on both the City's failure to bargain over the implementation of the policy and its failure to bargain over the policy's effects. Where an unfair labor practice charge "involves the interpretation or application of a collective bargaining agreement and said agreement contains a grievance procedure with binding arbitration as its terminal step," the Act provides that "the Board may defer the resolution of such dispute to the grievance and arbitration procedure contained in said agreement." *Id.* § 11(i).

¶ 40    When deciding whether to defer the resolution of an unfair labor practice claim to grievance arbitration, the Board has adopted the three frameworks applied by the National Labor Relations Board (NLRB). The *Collyer* doctrine applies where the union has not yet initiated a contract grievance. *Midlothian Fire Fighters Professional Ass'n, Local 3148*, 39 PERI ¶ 6 (ILRB State Panel 2022) (citing *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971)). The *Dubo* doctrine applies where grievance arbitration is ongoing. *Id.* (citing *Dubo Manufacturing Corp.*, 142 N.L.R.B. 431 (1963)). And the *Spielberg/Olin* doctrine (sometimes referred to simply as the *Spielberg* doctrine) applies where, as here, the grievance arbitration has concluded and an award has been issued. *Id.* (citing *Spielberg*, 112 N.L.R.B. 1080 (1955), and *Olin Corp.*, 268 N.L.R.B. 573 (1984)). Deferral is proper under that standard where "(1) the unfair labor practice issues have been presented to and

considered by the arbitrator; (2) the arbitration proceedings appear to have been fair and regular; (3) all parties agreed to be bound by the award; and (4) the arbitration is not clearly repugnant to the purposes and policies of the Act." *Id.*

¶ 41                                    1. Standard of Review

¶ 42    The parties disagree over our standard of review on the Board's deferral decision in this case. Our review of a decision of the Board is generally governed by the Administrative Review Law and extends to all questions of law and fact presented by the record. *American Federation of State, County & Municipal Employees, Council 31 v. Illinois State Labor Relations Board, State Panel*, 216 Ill. 2d 569, 577 (2005) (citing 5 ILCS 315/11(e) (West 2000) and 735 ILCS 5/3-110 (West 2000)). The applicable standard of review depends on the nature of the question. *Id.* Questions of law are reviewed *de novo*, findings of fact are reversed only where they are against the manifest weight of the evidence, and mixed questions of fact and law are reversed only where they are clearly erroneous. *Id.* Questions of this last sort are those in which " 'the historical facts are admitted or established, the rule of law is undisputed,' " and the only issue is whether the facts satisfy that standard. *Id.* (quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19).

¶ 43    The City argues we should review the Board's deferral decision for clear error. Reversal is appropriate under that standard where, based on the whole record, we are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Board of Trustees of the University of Illinois v. Illinois Labor Relations Board*, 224 Ill. 2d 88, 97-98 (2007). In support of clear error review in this context, the City relies on *Moehring v. Illinois Labor Relations Board, State Panel*, 2013 IL App (2d) 120342. The *Moehring* court applied that standard, however, because the parties to that case agreed that it should and noted that the case law was "less than clear" on the issue. *Id.* ¶¶ 12 n.3, 29.

¶ 44    The Board invites us to apply the more deferential abuse-of-discretion standard. An agency abuses its discretion when "no reasonable person would take the position [it] adopted or it has act[ed] arbitrarily, fail[ed] to employ conscientious judgment, [or] ignore[d] recognized principles of law." (Internal quotation marks omitted.) *Shawnee Community Unit School District No. 84 v. Illinois Property Tax Appeal Board*, 2022 IL App (5th) 190266, ¶ 88. The Board points out that both the Act itself, as noted above, and the Illinois Administrative Code (see 80 Ill. Adm. Code 1220.65(a) (2022)) employ the word "may," which is generally understood as permissive. See *People v. Reed*, 177 Ill. 2d 389, 393 (1997). And it argues that the *Spielberg/Olin* test is derived from federal law, where the prevailing approach is to review for an abuse of discretion (see *Mobil Exploration & Producing U.S., Inc., v. National Labor Relations Board*, 200 F.3d 230, 244 (5th Cir. 1999) ("The Board has considerable discretion in deciding whether it is appropriate to defer to an arbitration award, and courts will overturn the Board's determination only where that determination is an abuse of discretion.").

¶ 45    The Unions do not appear to take a firm stance on the matter. They cite *COUPE*, 40 PERI ¶ 74, a decision of the Board noting that deferral to arbitration is within the Board's discretion and it will choose not to defer if deferral will not promote administrative efficiency. But later, they conclude that the City has failed to show its decision was clearly erroneous, citing *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 97, a case that did not involve deferral to arbitration and that stands for the more general proposition that the clearly erroneous standard of review is proper where the Board's decision "represents a mixed question of fact and law."

¶ 46    We find that actually both standards apply here. The use of the word "may" in the deferral provision of the Act supports the Board's position that this is a discretionary decision. However, as federal courts have held when reviewing decisions of the NLRB, the criteria established by the

Board to guide its deferral decisions act as "self-imposed restraints limit[ing] its discretion," and reversal is proper where the Board has "clearly depart[ed] from its own standards." *Hawaiian Hauling Service, Ltd. v. National Labor Relations Board*, 545 F.2d 674, 676 (9th Cir. 1976). Where, as here, the parties agree that the *Spielberg/Olin* doctrine applies, the application of that test to the established facts is a classic mixed question of law and fact that we review for clear error. See *Shulte v. Flowers*, 2013 IL App (4th) 120132, ¶ 24 (explaining that courts may apply other standards of review "under the rubric of 'abuse of discretion,' " depending on the nature of the question).

¶ 47                          2. Denial on Procedural Grounds

¶ 48    At the outset, we reject the City's argument that we should reverse because the ALJ abused her discretion in refusing to reconsider the deferral decision at the end of the case. Under the Illinois Administrative Code, an ALJ has discretionary authority to rule on motions, regulate proceedings, and exercise discretion over the case record prior to issuing a final recommended decision. 80 Ill. Adm. Code 1200.40 (2021). We generally will not second-guess such procedural decisions, and we see no reason to do so here.

¶ 49    Moreover, we do not think the ALJ's decision not to reconsider deferral affected the outcome here. Our role is to review the decision of the Board, not that of the ALJ. In its final decision, the Board had before it all the arbitrator's supplemental awards and all the City's arguments as to why those decisions made deferral proper. Thus, the ALJ's determination not to revisit the deferral decision after her interim order had no impact on the Board's final decision in this case and has no impact on our review of that decision.

¶ 50                          3. Merits of the Deferral Decision

¶ 51    We turn now to the Board's decision that it should not defer to the arbitrator's numerous

awards determining how the City's vaccination policy should be implemented. The ALJ recommended, and the Board agreed, that the Board should defer to the arbitrator's determination that the City had the authority to enact the vaccination policy. However, in their view this did not extend to decisions regarding the policy's effects—the when and how of implementing the policy—that the arbitrator made.

¶ 52    Deferral under the *Spielberg/Olin* framework is proper where "(1) the unfair labor practice issues have been presented to and considered by the arbitrator; (2) the arbitration proceedings appear to have been fair and regular; (3) all parties to the arbitration agreed to be bound by the award; and (4) the arbitration is not clearly repugnant to the purposes and policies of the Act." *Moehring*, 2013 IL App (2d) 120342, ¶ 6. The ALJ's deferral decisions—that effects should be severed from the decision to implement the policy—rested on the first and fourth *Spielberg/Olin* factors, since in the proceedings before her the parties agreed, as they do now, that the arbitration was fair and regular (second factor) and that they had agreed to be bound by the arbitration (third factor).

¶ 53    Because the Unions were the charging parties, under Board precedent, they had the burden of establishing that deferral was not warranted. *Professional Fire Fighters of Elmhurst, Local 3541*, 39 PERI ¶ 99 (ILRB State Panel 2023) (citing *Olin*, 268 N.L.R.B. at 574). We find clear error in the Board's determination that the criteria for deferral were not met in this case.

¶ 54             a. Whether the Issues Were Presented to and Considered by the Arbitrator

¶ 55    Under the first *Spielberg/Olin* criterion, the Board must consider whether the questions at the heart of the Unions' unfair labor practice claims were already decided by the arbitrator. "An arbitrator has adequately considered an unfair labor practice claim if the contractual issue decided by the arbitrator is factually parallel to the unfair labor practice issue, and the arbitrator was

presented with the facts relevant to resolving the unfair labor practice issue." (Internal quotation marks omitted.) *Professional Fire Fighters of Elmhurst, Local 3541*, 39 PERI ¶ 99.

¶ 56     Federal courts reviewing decisions of the NLRB, which the Board looks to for guidance, have observed that, "[w]hen an unfair labor practice rests on factual issues of contract interpretation, the arbitrator may be in a superior position to resolve the merits of the unfair labor practice." *Ad Art, Inc. v. National Labor Relations Board*, 645 F.2d 669, 676 (9th Cir. 1980). They have also noted that the deferral decision "requires an accommodation of two competing policies. [Citation.] One policy favors exercise of the Board's jurisdiction to prevent unfair labor practices. The other policy favors settlement of labor disputes through arbitration." *Id.* at 674.

¶ 57     In this case, the Unions' claims that the City failed to bargain the effects of its vaccination policy rested precisely on whether, as the Unions alleged, the City had an obligation under the CBAs to bargain on all disciplinary and monetary effects of the vaccination policy, even if the City had the right to unilaterally implement the policy. This is precisely the issue of contract interpretation that the arbitrator had already decided.

¶ 58     The ALJ recommended, and the Board agreed, that the Board should defer to the arbitrator's determination that the City had the authority under the CBAs to decide to implement the policy. On the question of whether the City was required to bargain over the *effects* of the vaccination policy, however, the ALJ recommended, and the Board agreed, that deferral to the arbitration award was improper. The ALJ noted that the arbitrator had not made "key factual findings necessary for resolution" of that claim. In our view, the ALJ's recommendation rested on a misstatement as to what the arbitrator decided and a failure to recognize that, in the specific context of the COVID-19 crisis, the arbitrator viewed the effects as inseparable from the policy itself.

¶ 59    The ALJ's recommendation rested on her conclusion that the effects—the when and how of the policy's implementation—could in fact be severed from the initial decision to implement it. That is a question often answered by the Board when the parties agree that an employer can institute a policy but the union claims the employer must bargain effects. The obligation to bargain extends to effects that are not "an inevitable consequence of the decision itself." *Policemen's Benevolent & Protective Ass'n, Unit #5,* 36 PERI ¶ 113, *aff'd* 2021 IL App (4th) 200164.

¶ 60    In both the arbitrator's initial award and the supplemental decisions and awards he issued over the ensuing months, he resolved disputes over deadlines for getting each of the vaccine shots, what constituted good cause for extending those deadlines, whether the City's medical and religious exemptions were reasonable, the proper outcome of a number of disciplinary disputes, how the City should ensure that confidential medical information was not disclosed, and other similar issues. The arbitrator also considered what the ALJ referred to as "unilateral changes" by the City after the policy went into effect. Those included imposing discipline for an officer's failure to obey a direct order to report his or her vaccination status and eliminating the alternative safeguards of masking and testing. All of those were "effects" that arose from the City's decision to implement the vaccination policy, and the arbitrator clearly viewed them all to be within his purview and to be inseparable from the implementation decision itself.

¶ 61    Moreover, the Unions repeatedly came back to the arbitrator, asking that he resolve issues such as officers' no-pay status and reinstatement following compliance with the vaccination policy, the discipline of specific officers, exemptions, the officers' entitlement to personal days, and how to handle officers who had filed notices of intent to retire, among other issues.

¶ 62    We recognize that the arbitrator never expressly stated that the key effects of the policy could not be severed from the decision to implement it, but he did not have to. Although that

18

question was never specifically put to him, by again and again resolving questions concerning the effects of the policy, often at the Unions' urging, the arbitrator did indeed—implicitly if not explicitly—determine that, at least in the context of the ongoing COVID 19 crisis, those matters were not severable from the decision to implement the policy.

¶ 63    We also find it significant that the Unions, far from pumping the brakes on the arbitrator's continued decision-making, repeatedly came to him with their concerns and were able to obtain relief on behalf of their members on a number of contested effects-based issues. By drawing no distinction between the decisional and effects-based aspects of the City's policy, this seasoned arbitrator, who was well-versed in the drawing of such distinctions, made clear that he did not believe, as a practical matter, that the two could or should be parsed under the circumstances presented here.

¶ 64    In declining to defer, neither the Board nor the ALJ addressed the ALJ's first decision, issued before the arbitrator issued his award, that issues regarding both the implementation and the effects of the policy should all be deferred to the arbitrator. When the ALJ made that recommended decision in January 2022, she expressly recognized that "the arbitrator's interpretation of the parties' contracts [wa]s needed to determine whether the contracts permitted the [City] to implement the vaccination policy, *including those aspects of the policy that the Unions identif[ied] as its key effects*." (Emphasis added).

¶ 65    We are not suggesting that either the ALJ or the Board was bound by this earlier recommended deferral decision. But the ALJ's prediction that the arbitrator would make decisions about whether the CBAs permitted the City to implement the vaccination policy in the ways that it did, including imposing what the Unions identified as "key effects" on their members, absolutely came to pass. And indeed, at the Unions' ongoing urging that he do so, the arbitrator continued to

decide what the CBAs permitted the City to do to implement the vaccination policy.

¶ 66    The cases the ALJ relied on in recommending that the Board not defer are readily distinguishable. In *North Shore Sanitary District v. Illinois State Labor Relations Board*, 262 Ill. App. 3d 279, 295-96 (1994), the arbitrator had determined that just cause existed for the discharge of a handful of employees. The unfair labor practice claim before the Board in that case, however, alleged that the employer's disciplinary and discharge actions were motivated by anti-union animus and were carried out in retaliation for protected activities. *Id.* at 296. In *Water Pipe Extension v. City of Chicago*, 206 Ill. App. 3d 63, 68 (1990), deferral to an arbitrator's award reclassifying certain employees under a new personnel rule was improper where the heart of the unfair labor practice claim—that the union had been misled during contract negotiations concerning the rule—was simply not presented to the arbitrator. In both of those cases, there was an important consideration under the Act that was independent of whether the collective bargaining agreement permitted the employer to take the action it did.

¶ 67    The same was simply not true here. The ALJ and Board identified seven key effects of the vaccination policy that the City failed to negotiate that, in their view, had not been resolved by the arbitrator: "(1) consequences for non-compliance; (2) implementation date; (3) paid time off for employees who become vaccinated; (4) injury on duty status for those employees suffering side effects from the vaccination; (5) indemnification of officers who incurred medical expenses as a result of obtaining the vaccine; (6) who would bear the costs of testing and the breadth of the testing requirement; and (7) incentives to encourage employees to become vaccinated." The Unions' argument that there "is no evidence in the Record to support the fact that the Arbitrator considered these issues" is plainly not true. Among the first things the arbitrator did in his initial award was establish new deadlines for officers to receive their first and second injections of the

vaccine and rule that employees who were unable to report to work due to adverse reactions to the vaccine would receive the same sick leave benefits as for other ailments (Nos. 2 and 4 above). And his subsequent awards were in large part concerned with the disciplinary framework the City had and would continue to employ as it enforced the policy (No. 1). Incentives to encourage vaccination (No. 7), to the extent that they were suggested in lieu of a vaccine mandate, were not an effect of the City's policy but an alternative to it. To the extent that incentives were employed to encourage early vaccination under the policy, however, they too were addressed by the arbitrator, when he considered how and when union members who had promptly complied could use the extra personal days awarded to them as a result. And questions regarding how the testing option would work (No. 6) were mooted when the City removed that option from the policy.

¶ 68     Those certainly constituted the bulk of the Unions' concerns. The arbitrator made clear that he was exercising continuing jurisdiction to decide "any issues raised by the parties concerning [the] Award or the subject matter of this dispute," and the Unions accepted that invitation by repeatedly bringing such matters to his attention. To the extent that some minor questions were not expressly addressed by him, it seems likely that disputes relating to those questions simply did not arise or, if they did, that the Unions did not view them as significant enough to bring to him.

¶ 69     The central questions here—concerning both the decision to implement the policy and its effects—were squarely presented to and addressed by the arbitrator. The first *Spielberg/Olin* criterion for deferral was thus clearly met here.

¶ 70          b. Whether the Arbitration Award Was Clearly Repugnant to the Act

¶ 71     Under the fourth *Spielberg/Olin* criterion, the Board considers whether the arbitral award is clearly repugnant to the purposes and policies of the Act. See *Professional Fire Fighters of Elmhurst, Local 3541*, 39 PERI ¶ 99. The test is not whether the Board would have reached the

same result but whether the arbitration award is "palpably wrong as a matter of law," *i.e.*, susceptible to no interpretation consistent with the Act. *Id.*

¶ 72    The Unions insist, as the Board found, that the arbitrator's award is repugnant to the Act and "palpably wrong as a matter of law" because it goes against well-established policies in favor of the right to bargain. In this case, the arbitrator treated the City's methods for implementing the vaccination policy as inseparable from the policy itself and thus implicitly concluded that bargaining was not required on effects, just as it was not required on the vaccination policy itself. While the Board may disagree, that determination does not undermine the important statutory right to bargain. There was nothing in the arbitration award that was repugnant to the Act.

¶ 73                              c. Whether the Board Abused Its Discretion

¶ 74    The Unions argue that the City can point to no Illinois case reversing the Board for a failure to defer. But federal courts construing the National Labor Relations Act have reversed decisions of the NLRB on that basis. In *Verizon New England Inc. v. National Labor Relations Board*, 826 F.3d 480, 483-84 (D.C. Cir. 2016), for example, the United States Court of Appeals for the District of Columbia held that the NLRB abused its discretion when it refused to defer to an arbitration decision concluding that the union in that case, as part of its express waiver of the right to picket, had also waived the right of its members to display pro-union signs in the windshields of their cars. The NLRB had concluded, under the fourth *Spielberg/Olin* factor, that it need not defer to that " 'clearly repugnant' " interpretation of the parties' agreement, since the National Labor Relations Act specifically protected the right to picket. *Id.* at 485.

¶ 75    The court of appeals reversed, explaining that, under *Spielberg/Olin*, there are only two circumstances under which the NLRB may elect not to defer to an arbitrator's construction of the parties' contract: (1) where the arbitrator concluded that a right was waived that legally cannot be

waived or (2) where the arbitrator's reading of the contract was " 'palpably wrong.' " *Id.* at 486 (quoting *Olin*, 268 N.L.R.B. at 574). That phrase "means what it suggests," the court emphasized. *Id.* 487. The award must be not just wrong but "[e]gregiously wrong, clearly erroneous, badly flawed, totally wrong, jumping the rails." *Id.* at 487. Absent any indication of an error of that magnitude, it was unreasonable and an abuse of discretion for the Board to find an unfair labor practice. *Id.* at 488; see *National Labor Relations Board v. Pincus Bros., Inc.-Maxwell*, 620 F.2d 367, 374-75 (3d Cir. 1980) (noting that the parties "accepted the risk that arbitration results could differ from Board decisions when they elected to proceed by arbitration" and "the Board recognized such possibilities when it adopted the policy to defer to an arbitrator's award").

¶ 76 Federal cases like these are persuasive authority (*American Federation of State, County & Municipal Employees v. Illinois State Labor Relations Board*, 190 Ill. App. 3d 259, 264 (1989)), particularly where the Board has expressly adopted the NLRB's *Spielberg/Olin* framework when deciding whether to defer to an arbitration award (*Moehring*, 2013 IL App (2d) 120342 ¶ 6).

¶ 77 As noted above, in our view the Board misapplied the *Spielberg/Olin* framework. The circumstances under which the City implemented its vaccination policy and the Unions challenged it are, we believe, an important consideration. There will often be little urgency—or certainly much less urgency than that present here—for an employer to implement a policy quickly. There will be time to proceed in a clear and orderly fashion and, in many cases, to parse the policy itself from its effects, which may still be bargained over without impinging on the employer's contractual right to effectively implement the policy. See, *e.g.*, *Fraternal Order of Police, Lodge #7*, 38 PERI ¶ 20 (ILRB Local Panel 2021) (processes by which supervisors would review and disclose footage were severable and bargainable effects of the City's decision to participate in a pilot program for the use of body-worn cameras by police officers). But in this case there was limited

time, and the arbitrator continued to decide numerous effects-based issues based on his conclusion, reinforced by the Unions continuing to bring issues to him, that effects could not be severed from the policy itself.

¶ 78    The grievance arbitration, which moved quickly, became the *de facto* center of gravity. It was where both sides brought their concerns. And, although we do not agree with the City's contention that those proceedings should now be viewed, after-the-fact, as bargaining and interest arbitration, the situation was certainly a fluid one. Distinctions were not made between decisional and effects-based aspects of the policy, and continued negotiations were effectuated through the arbitration process. As the Board decisions and case law make clear, the decisional and effects-based aspects of an employer's policy can often be severed and dealt with separately. The unique circumstances of the COVID- 19 crisis made that impossible here.

¶ 79    Now, with the pandemic behind us and with benefit of hindsight, the Board wants to undo actions the City took in accordance with the arbitrator's rulings, which were made when the circumstances were far more urgent and when practical decisions regarding the City's implementation of its policy needed to be made quickly, if it was to have its intended effect. These parallel proceedings have left the City with two conflicting interpretations of what it was permitted to do under the CBAs. That is what deferral, meant to encourage parties to resolve labor disputes through arbitration, is intended to avoid. *Ad Art, Inc.* 645 F.2d at 674.

¶ 80    As the Board has recognized, it is the arbitrator's role, and not the Board's, to determine what the parties' contract says. See *Amalgamated Transit Union, Local 1028*, 10 PERI ¶ 2023 (ILRB State Panel 1994) (noting that deferral promotes the Act's policy of favoring arbitration as the preferred means of resolving disputes over the meaning and application of collective bargaining agreements). The Board's refusal to defer means that the City must now undo

everything that it did to implement the vaccination policy. Union members who blatantly violated the policy and were disciplined must be given back pay with interest and records of any violations expunged. It will be as if this policy was never implemented, although an arbitrator that the parties chose to decide the issue concluded that it was permitted under their CBAs. Such a result is contrary to the very notion of collective bargaining.

¶ 81    Our conclusion on deferral makes it unnecessary for us to reach the City's remaining arguments for reversal. We note that both of those arguments rest on the contention that the Board was required by law to agree with the arbitrator that the CBAs gave the City the unilateral right to implement the policy as it did, with no bargaining, and that the Board was required to find that the effects were not severable from the policy itself. That is certainly not our holding here. Rather, our holding is that, once the parties had submitted those issues to an arbitrator who had determined that the CBAs gave the City the authority to implement the policy in the manner it did, it was an abuse of discretion for the Board not to defer to that interpretation.

¶ 82                      B. The City's Response to Information Requests

¶ 83    We are left only to consider the Board's finding, based on the ALJ's recommended decision, of an unfair labor practice based on the Unions' claims that the City failed to adequately respond to their requests for information regarding the vaccination policy. The Board has found a violation of sections 10(a)(1) and (4) of the Act arising from an employer's refusal to furnish a union with requested information where "(1) the employer has failed to act in good faith, or (2) the employer's failure to produce the requested information has meaningfully interfered with the union's ability to fulfill its representative's role." *Policemen's Benevolent Labor Committee*, 19 PERI ¶ 11 (ILRB State Panel 2003). We do not think either of those circumstances applies here, and to the extent the Board found otherwise, it was clear error.

25

¶ 84     Before considering the specific responses that the ALJ and Board found inadequate, it is appropriate, we think, to appreciate the City's overall efforts to provide the Unions with relevant information concerning the vaccination policy. The Unions submitted a list of twelve requests for documents and information to the City on August 25, 2021. Those requests were wide-ranging, covering the nature and scope of the hazards presented by the COVID-19 pandemic, the steps the City had taken to mitigate the threat to its employees, and targeted inquiries concerning how the City planned to implement various aspects of the policy. The City responded one week later to each of the requests and supplemented that initial response less than one week after that. Throughout the monthlong negotiations that followed, the City responded to multiple additional written and verbal requests concerning, for example, employee consequences for failing to comply with the policy and information about the vaccination portal. The Unions identify no instance in which the City ever ignored a request or refused to provide requested information. And, as the ALJ noted, the Unions never objected to the timeliness or completeness of the City's responses.

¶ 85     One request identified by the ALJ sought the number of officers who had been vaccinated, by bargaining unit, who had still contracted COVID-19. The ALJ concluded that information "was relevant and necessary for the [Unions] to develop their effects bargaining strategy and effects bargaining proposals." As the ALJ herself recognized, however, "[a]n employer need not supply information on a nonbargainable subject." *Village of Franklin Park v. Illinois State Labor Relations Board*, 265 Ill. App. 3d 997, 1004 (1994). The arbitrator did not view the City as having any duty to bargain over the effects of its vaccination policy, and we have held here that the Board abused its discretion in failing to defer to the arbitrator on that point. It was clear error to find the failure to provide this information was an unfair labor practice.

¶ 86     The ALJ also found that the City had unlawfully failed to provide information on the

location of the City's contractors who, unlike employees, were initially not subject to the vaccine mandate and who could expose union members to COVID-19 and thereby pose a risk to its members. According to the Unions, that information was needed to help protect the health of officers who had to work with City contractors. However, the City agreed to modify its vaccination policy to cover contractors on September 20, 2021, before the Unions even brought their unfair labor practice charges to the Board. The ALJ correctly noted that an information request does not automatically become moot simply because the information is no longer necessary or relevant. *Highland Community College Faculty, Local 1957*, 41 PERI ¶ 51 (IELRB 2024). Here, however, the Unions' concerns regarding how the vaccination policy would affect its members were being addressed in real time by the arbitrator. The arbitrator considered at length the medical testimony presented by both sides regarding how the final policy—applicable to both employees and contractors—would affect the health and safety of officers and exercised continuing jurisdiction to resolve any further issues raised by the parties. The Unions have made no showing that any alleged deficiencies in the information provided by the City undermined their ability to participate in a meaningful way in the arbitration or to protect the safety of their members.

¶ 87    The ALJ also concluded that the City's responses to the Unions' requests for information concerning how it had and would compensate or pay the medical expenses of officers who contracted COVID-19 were "overly generalized and obviously incomplete" where the City had stated that such matters were covered by the parties' CBAs and "related general orders" but had not specified which orders it was referring to. That, in the ALJ's view, warranted an inference of bad faith. But the City provided that response on September 1, 2021, just one week after receiving the Unions' requests, and supplemented its response less than one week after that, on September 7, 2021, stating that it was "still investigating and gathering documents." The parties went on to

27

engage in extensive negotiations over the next months and numerous hearings before the arbitrator. A considerable amount of information was exchanged, and as the COVID-19 crisis developed and the City responded to new situations, the Unions were clearly kept apprised. Nothing suggests that either bad faith by the City or a lack of information interfered with the Unions' role in representing their members. The Board's finding to the contrary is clearly erroneous.

¶ 88     Finally, the ALJ concluded the City failed to adequately respond to the Unions' requests for materials showing the procedures used for reviewing and granting requests for religious accommodations. The City's religious and medical accommodations were thoroughly debated by the parties at arbitration, however, and the arbitrator not only found they were reasonable but resolved several of the Unions' concerns regarding how those provisions would be implemented. Once again, if a lack of information hindered the Unions' ability to present their concerns to the arbitrator, they could certainly have made that point to him.

¶ 89     The Board's determination that the City committed unfair labor practices based on a failure to disclose requested information was clearly erroneous. See *Board of Trustees of the University of Illinois*, 224 Ill. 2d at 97 (we will find clear where we are "left with the definite and firm conviction that a mistake has been committed" (internal quotation marks omitted)).

¶ 90                                    IV. CONCLUSION

¶ 91     For all of the above reasons, we reverse the Board's final administrative decision and order in this matter.

¶ 92     Reversed.

*City of Chicago v. Fraternal Order of Police, Lodge 7*, **2026 IL App (1st) 242531**

| | |
|---|---|
| **Decision Under Review:** | Petition for Review of order of the Illinois Labor Relations Board, Local Panel, No. L-CA-22-008. |
| **Attorneys for Appellant:** | Jennifer A. Dunn and John E. Swinney, of Franczek P.C., of Chicago, for petitioner. |
| **Attorneys for Appellee:** | Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Jonathon M. Studer, Assistant Attorney General, of counsel), for respondent Illinois Labor Relations Board. |
| | Joel D'Alba and Naomi Frisch, of Asher, Gittler & D'Alba, Ltd., and Jason Lee, of Policemen's Benevolent Labor Committee, both of Chicago, other respondents. |